United States Courts
Southern District of Texas
FILED

OCT 19 2023

Nathan Ochsner, Clerk of Court

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

TIMOTHY AGUILAR                                  Case No. _____
    Plaintiff

v.

NETWORK INSURANCE SENIOR HEALTH
DIVISION ALG, LLC, ONVOY LLC, BANDWIDTH.INC,
PEERLESS NETWORK, INC & BERKEN MEDIA LLC

                                          JURY TRIAL DEMAND
    Defendants

## COMPLAINT

Plaintiff **Timothy Aguilar** ("Plaintiff and or Aguilar") in pro se, alleges the following

against **Network Insurance Senior Health Division ALG, LLC** (hereinafter NISHD**) &**

**Peerless Network. Inc** (hereinafter "Peerless"), **Onvoy LLC** (hereinafter "Onvoy"),

**Bandwidth, Inc** (hereinafter "Bandwidth") and **Berken Media LLC** (hereinafter "Berken") and

other unknown third-party telemarketing vendors/sellers directed by Defendants:

### SUMMARY OF THE CASE

1. Plaintiff's Complaint is filed upon the Telephone Consumer Protection Act ("TCPA"), 47

   U.S.C. §227 *et seq*

2. As the Supreme Court has explained, "Americans passionately disagree about many

   things. But they are largely united in their disdain for robocalls. The Federal Government

   receives a staggering number of complaints about robocalls—3.7 million complaints in

   2019 alone. The States likewise field a constant barrage of complaints. For nearly 30

   years, the people's representatives in Congress have been fighting back. As relevant here,

   the Telephone Consumer Protection Act of 1991, known as the TCPA, generally

prohibits robocalls to cell phones and home phones." *Barr v. Am. Ass'n of Political Consultants,* 140 S. Ct. 2335, 2343 (2020). The TCPA and its accompanying regulations prohibit named Defendants from making telephone solicitations to persons who have listed their telephone numbers on the national Do Not Call Registry (hereinafter "DNCR"), a database established to allow consumers to exclude themselves from telemarketing calls, which include text messages, unless they consent to receive the calls in a signed, written agreement. The TCPA also prohibits Defendants from making telephone calls to persons that feature a prerecorded or artificial voice without the prior express consent of the party called.   Named Defendants have chosen to knowingly, willfully and with a callous disregard, ignore the meaning of the TCPA and feel that they are above the law.

**3.** Plaintiff is one individual out of the millions that have registered their numbers on the national DNCR. Nevertheless, Plaintiff has received over seven-hundred (700) illegal robo/telemarketing calls at the time of filing this Complaint. A majority of the robo calls being transmitted by Onvoy LLC, Peerless Network and Bandwidth and other VoIP service providers.

**4.** Plaintiff has been harassed, cussed at, victimized by the hundreds of illegal telemarketing robo calls made by Defendants, including without limitation the robocalls soliciting car warranties, medical & diabetic services, final expense services, home solar products, accident claim legal services,  This case evolves from a campaign by NISHD to market its services and or products through the use of pre-recorded telemarketing calls in plain violation of the TCPA, to which Bandwidth, Peerless and Onvoy have initiated and or facilitated with their VoIP call services technology.

5. Plaintiff has received over seven-hundred (700) illegal robo calls with a high percentage of robo calls being phone recorded by Plaintiff to be presented at trial herein. Plaintiff is entitled to damages under the TCPA from each individual named Defendants herein. NISHD has engaged in improper and deceptive telemarketing practices by placing improper and unwanted telemarketing calls to Plaintiff on a daily basis. To promote its services and solicit new clients, NISHD has engaged in a telemarketing campaign to send harassing, robo calls soliciting final expense and medicare services to Plaintiff without proper consent and or any type of previous business relationship.

6. To generate leads, regardless of violating federal law, NISHD has hired TCPA violators Onvoy, Bandwidth and Peerless to initiate and or promote calls to Plaintiff and attempt to persuade him to schedule an appointment or provide personal information to their telemarketers to further their scheme.

7. At the time of these over seven-hundred (700) telemarketing calls made, facilitated, initiated and or assisted by Defendants Onvoy, Peerless and Bandwidth, including without limitation robocalls offering Plaintiff car warranties, medical services, final expense services, Medicare services, home solar, IRS, accident claim legal services and many other scams, Plaintiff was on the DNCR since about 2011.

## JURISDICTION AND VENUE

8. This Court has subject-matter jurisdiction over the TCPA claims in this action under 28 U.S.C. § 1331, which grants this court original jurisdiction of all civil actions arising under the laws of the United States. *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 386-87 (2012) (confirming that 28 U.S.C. § 1331 grants the United States district courts federal-question subject-matter jurisdiction to hear private civil suits under the TCPA).

**9**. This Court has personal jurisdiction over named Defendants herein who conduct business in the State of Texas.

**10**. Venue is proper under 28 U.S.C. § 1391(b)(2).

## PARTIES

**11**. Plaintiff is a natural person residing in Pasadena, Texas, 77503.  Plaintiff has been the exclusive user of telephone number 832-XXX-7311.

**12.** Plaintiff is a "person" as that term is defined by 47 U.S.C. § 153(39).

**13**. Defendant NISHD is a business entity with principal place of business, head office, or otherwise valid mailing address at 2650 McCormick Drive, Suite 200S, Clearwater, Fl 33759.

**14.** NISHD's Registered Agent for Service of Process: Corporation Service Company d/b/a CSC – Lawyers Incorporating Service Company – 211 East 7th Street, Suite 620, Austin, Texas 78701.

**15.** Defendant Onvoy LLC is or has been an interconnected VoIP provider, a known TCPA violator with its headquarters at 550 West Adams Street, Suite 1130, Chicago, IL 60661.

 **16**. Defendant Peerless Network, Inc. is or has been an interconnected VoIP provider, a known TCPA violator with its headquarters at: 433 West Van Buren Street, Suite 410S, Chicago, IL 60607.

**17.** Defendant Berken Media is a lead generation company that specializes in legal case generation for plaintiff lawyers and laws firms with its corporate address at: 633 Chestnut St, Chattanooga, TN 37450.

**18.** Defendant Bandwidth Inc, is an interconnected VoIP service provider, a known TCPA violator with its headquarters at: Venture Center III, 900 Main Campus Drive, Raleigh, NC 27606

**19**. Unless otherwise indicated, the use of Defendant's name in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, vendors, and insurers of Defendants.

## ACTS OF AGENTS

**20**. Whenever it is alleged in this petition that any Defendant did any act, it is meant that the Defendant performed or participated in the act or that Defendant's officers, agents or employees performed or participated in the act on behalf of and under the authority of a Defendant

## FACTUAL ALLEGATIONS

### A. The National Do Not Call Registry

**21**. In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry.     In so doing, Congress recognized that "[u]nrestricted telemarketing . . . . can be an intrusive invasion of privacy[.]" Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

**22**. The DNCR allows consumers to register their telephone numbers and thereby indicate their desire not to receive telephone solicitations at those numbers. See 47 C.F.R. § 64.1200(c)(2). Just as Plaintiff registered years ago. See Exhibit A

**23**. A listing on the DNCR "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database

administrator." *Id.*   Plaintiff's registration on the DNCR is active and has not been removed. *Id*

**24**. The TCPA and implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers to the DNCR and provides a private right of action against any entity that makes those calls, or "on whose behalf" such calls are promoted. 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2). Pre-trial discovery should reveal on *whose behalf* the nearly 700 robo calls received by Plaintiff were promoted upon. The true names of the sellers /telemarketers who are also liable in this action.

**25**. The FCC's regulations implementing the TCPA also require persons or other entities that make telemarketing calls to maintain company-specific do-not-call lists and to honor do-not-call requests. 47 C.F.R. § 64.1200(d). Company-specific do-not-call requests must be honored for five years from the time the request is made. 47 C.F.R. § 64.1200(d)(6). Sellers must coordinate the do-not-call requests received by their telemarketers, so that all telemarketing calls on behalf of the seller cease if a consumer makes a do-not-call request to one of the seller's telemarketers.

## B. THE TCPA RESTRICTIONS ON CALLS USING ARTIFCIAL OR PRERECORDED VOICES

**26**. The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service without the prior express consent of the recipient." See 47 U.S.C. § 227(b)(1)(A).

**27**. The TCPA provides a private cause of action to persons who receive calls in violation of 47 U.S.C. § 227(b)(1)(A). See 47 U.S.C. § 227(b)(3).

**28**. According to findings by the Federal Communication Commission ("FCC"), the agency Congress vested with authority to issue regulations implementing the TCPA, such calls are prohibited because, as Congress found, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient.

**29.** The FCC also recognized that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used." In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991, CG Docket No. 02-278, Report and Order, 18 FCC Rcd 14014, 14115 ¶ 165 (2003)

**30**. In 2012, the FCC required prior express written consent for all autodialed or prerecorded telemarketing calls ("robocalls") to wireless numbers and residential lines. Specifically, it ordered that:

[A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received "clear and conspicuous disclosure" of the consequences of providing the requested consent, i.e., that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates.[] In addition, the written agreement must be obtained "without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service." In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 27 FCC Rcd 1830, 1844 (2012).

**31**. Under the TCPA, the burden is on the Defendant to demonstrate that Plaintiff gave his prior express consent to receive a call featuring prerecorded message and artificial voices to his cellular that is currently on the DNCR. In this case, neither Defendant is able to prove such burden.

**C. TECHNOLOGY USED IN ROBOCALLING SCHEMES AND THE DECEPTIVE BUSINESS PRACTICES, DECEPTIVE MARKETING SCAMS THAT ONVOY, BANDWIDTH, BERKEN MEDIA AND PEERLESS FACILITATE AND OR ALLOW IN ILLEGAL CALLS TO PLAINTIFF**

**32.** Defendant's Onvoy, Peerless, and Bandwidth are interconnected for profit VoIP providers that provide their customer's – in this case, NISHD and other clients/telemarketers not yet named in this Complaint – with a full suite of VoIP software and network connectivity to operate their telemarketing business and or obtain and generate leads to set and or schedule appointments.

**33**. Onvoy states on their parent company's (Sinch) website "Reach any mobile phone on the planet with our powerful messaging APIs." [1] "People trust what they recognize and with a local phone number, you're halfway through their door already." "140 million phone numbers powered by our network."[2]

**34**. Onvy claims it has "True global reach" because it can "[r]each any mobile phone on the planet – in seconds, or less. Sinch also claims it is a **"One-stop shop"** offering "CPaas, SMS, Voice, Video, Verification, SMS, rich messaging, SaaS and more ... we're here for all your mobile messaging needs." Finally, Sinch claims to offer "World-class support" and advertises its customer service claiming "[w]e don't want to sell you a product. We want to help you succeed. Enterprises love our superior customer service!" Sinch advertises on its website that "You can depend on us," that it has 115,000,000 phone numbers powered by its network with 300,000,000,000 minutes of use on its network annually.

**35**. Peerless boasts that "Peerless Network has always been at the forefront of innovation, originally re-thinking and re-shaping how telecom markets should work. We designed a

---

[1] https://www.sinch.com/products/

[2] https://www.sinch.com/products/voice/voice-services/

smart, efficient, strategic network, and developed products and solutions that optimize how traffic can be handled. We are driven to continuously expand our network reach, including international locations, and strive to simplify how customers communicate …. drive to adapt and thrive in an ever-changing marketplace."[3]

**36**. Bandwidth boasts that it has access to millions of phone numbers across more than 60 countries.[4] Bandwidth also makes mention about robocalling, i.e., "…. the term "robocalling" has become commonly understood to broadly mean illegal calling by scammers for fraudulent purposes. Unfortunately, people are often not sure whether the calls they are receiving are legitimate or unlawful robocalls. One sure sign of an illegal robocall is when a caller does not leave a voicemail message when you fail to answer a call …. would advise anyone to quickly hang up if the caller does not provide satisfactory identification at the beginning of the call, or if you're not offered the option to opt out ……. automated and pre-recorded calls are not allowed if they do not have your written consent, or if your number is on the National Do Not Call list. Note however that certain kinds of robocalls may not require your prior consent."[5]

**37**. Bandwidth further promotes on their website "…real-time caller ID on origination calls powered by Bandwidth. Ensure your customers know who's calling, because when it comes to voice calls, everybody should know your name."[6]

---

[3] https://www.peerlessnetwork.com/about-us/

[4] https://www.bandwidth.com/solutions/communication-service-providers/

[5] https://www.bandwidth.com/glossary/robocalling/

[6] https://www.bandwidth.com/phone-numbers/cnam-caller-id-name/

**38**. Berken Media promotes itself as a "Advertising Agency" on its Facebook page.[7]  In reality, Berken generates leads via the robo calling (call center overseas) to individuals who are on the DNCR, like plaintiff.  Plaintiff received about eighty-seven (87) robo calls from Berken since January 2023 with the majority of illegal robo calls recorded.

**39**. The technical ability to place robocalls is dependent on (1) voice-over-interest-protocol (VoIP) and related technology to create the calls, and (2) a "gateway carrier" to introduce the (often foreign) phone traffic into the U.S. phone system. The term "gateway carrier" refers to a U.S.-based person or entity that agrees to accept VoIP traffic (often from a foreign source) and either pass the traffic to a downstream VoIP carrier or deliver the call directly to the consumers' phone thereby routing the calls to their final destination in the United States. VoIP uses broadband internet connection – as opposed to an analog copper phone line – to place calls locally, long distance, and internationally, without regard to whether the call recipient uses a cellular phone or a traditional, wired phone. The technology employed by modern telecommunication providers mediates between digital VoIP signals and regular telephone signals so that communication is seamless between VoIP users and non-VoIP users at either end. VoIP is used in telemarketing schemes both to make the initial robocall to U.S. phones and to communicate with individuals who either answer the robocall or call the number contained in the recorded message.

**40**. VoIP relies upon a set of rules for electronic communication called Session Initiation Protocol (SIP). Much like the way browsing websites on the internet uses HyperText Transfer Protocol (HTTP) to initiate and conduct information exchanges between devices

---

[7] https://www.facebook.com/BerkenMedia/

through exchanges of packets of information, SIP is a set of rules used to initiate and terminate live sessions for things such as voice and video communication between two or more points connected to the internet. Both SIP voice communication and HTTP web-browsing rely on exchanging data packets between two points. For example, web browsing via HTTP requires an individual to request information from another point on the internet, usually by clicking on a hyperlink or entering a web address in the browsers' address bar, usually preceded by http://www, which tells the device that it is making a request for information on the World Wide Web via HTTP. A device receiving that request will send back information to the requesting device, and thus, the requesting device will display the requested website.

**41**. Similarly, a voice call via SIP starts as a data packet sent to initiate a call, a responsive packet sent back that indicates whether the call has been answered, and numerous other packets transiting back and forth; amongst these data packets is information that machines turn into audible signals, i.e., a conversation that can be heard by the participants. In the case of robocalls, a recorded message is transmitted once the call is answered by voicemail picking up or a live person answering.

**42**. Robocalls should not be understood as traditional phone calls. Rather, they are requests for information and responsive data packets transiting the internet via SIP. An outgoing robocall begins as a request for information sent by an automated system for selecting and dialing telephone numbers that enables the caller to make millions of sequential requests for information (i.e., outbound VoIP phone calls) in a very short time. This is a specialized type of telecommunications equipment with the capacity to (1) store or produce telephone numbers to be called, and (2) request responsive information from devices at the other end of the call, i.e., dial telephone numbers. The requests for

information are directed to devices (here, telephones) that send back responsive information when the call is answered either by a live person or the person's voicemail. When it receives information from the called device indicating that the call is answered, it will then send information back to that device (the phone) in the form of a recorded message.

**43**. Upon information and belief, Defendants Onvoy, Bandwidth and Peerless create these recordings with artificial voices (or "bot" voices) as Plaintiff has received and recorded the inbound illegal robo calls during his answering his cell phone and recording such bot voices.

**44**. These robocalls made by the three amigo Defendants can not only send prerecorded messages to the plaintiff's phone, but can misrepresent who is calling on the caller ID. Normally, a recipient's caller ID will display information identifying the caller by means of a telephone number; however, many VoIP software packages allow the caller to specify the information appearing on the call recipient's caller ID, much in the same way an email's subject line can be edited to state whatever the sender wishes. This practice of specifying what appears on the recipient's caller ID is called "spoofing." This feature of VoIP technology permits a caller with an illicit motive to spoof a legitimate phone number in order to cloak the fraudster with indicia of authority and induce the recipients to answer the call. Spoofing also encourages potential victims to return calls when they look up the spoofed number and see that it is a number used by an official government entity. In the robocall schemes described throughout this Complaint, spoofing serves the purpose of deceiving the potential target of an unsolicited robocall about who is calling them.

**45.** Spoofing any phone number is a simple matter of editing a SIP file to state the desired representation on the caller ID. These files can then be loaded by either of these TCPA

violators into an automatic system for the selection and dialing of telephones to become robocalls, replicated millions of times with the spoofed, fraudulent caller ID information.

**46.** The robocalls generally leave prerecorded messages containing misinformation. Some of these messages direct the recipient to press a key to speak with a live operator. Other messages leave a domestic telephone number as a "call-back" number. In either case, the recipient is connected to a fraudster at a (often foreign) call center. Robo calls, for instance, like the ones Plaintiff received, a high percentage being pre-recorded messages but have the capability to be transferred to a live and scheming professional fraudster who attempts to deceptively obtain personal information from the consumer, in this instance, the plaintiff as evidenced by the actual hundreds of live recordings between the robo caller and himself.

## D. Defendant Onvoy, Peerless, Bandwidth and Berken Media Scheming, Deceptive and Illegal Business Practices Demonstrate They Are Liable for Making the Calls at Issue to Plaintiff.

**47**. Onvoy, Bandwidth, Peerless are interconnected VoIP providers that are in the business of facilitating or initiating robo calls and/or helping others make robocalls, regardless if it violates the TCPA and or any other federal statute. Onvoy's parent company Sinch states on its website that it provides voice termination, which means it carriers calls from overseas and passes them into the U.S. telephone system and will pass calls from the United States to overseas destinations. With respect to many of the robocalls described throughout this Complaint for which Defendants provides termination services, it is a gateway carrier. In the context of these telemarketing schemes, U.S.-bound robocalls are "U.S. terminat[ed]" calls and return calls to telemarketing fraudsters in other countries are "international voice terminat[ed] calls.

**48**. Onvoy, Peerless and Bandwidth also provide the telephone numbers used to make these calls, the network through which these calls are placed, the hardware and software

needed to make the calls, and the automated equipment needed to make massive amounts of robocalls. Defendant Onvoy, Bandwidth and Peerless are the ones that make or initiate the actual call to consumers using their VoIP technology. Upon information and belief, telemarketer's in foreign call centers merely wait for Peerless, Bandwidth, Onvoy to route a live caller to the call center if the recipient does not hang up immediately or ignores the call.

**49**. Upon information and belief, Onvoy, Bandwidth and Peerless know or consciously avoided knowing that telemarketers or sellers were transmitting robocalls across their networks and using Onvoy's, Bandwidth and Peerless VoIP services to send call traffic that violated federal and state laws.

**50**. Onvoy, Bandwidth and Peerless have provided substantial assistance to robocallers and facilitated the transmission and eventual delivery of pre-recorded telephone calls to Plaintiff's cell number.

**51**. Onvoy, Bandwidth and Peerless and their clients and or customers made or initiated calls to Plaintiff's cell phone using artificial and or prerecorded voices to deliver messages without the prior express consent of the called party, being the named plaintiff herein.   Some of Onvoy's,  Bandwidth and Peerless customers were telemarketers, sellers, scammers and or fraudsters trying to obtain personal (social Security #, Date of Birth, credit card #) information from plaintiff as evidenced by the recordings.

**52**. Onvoy, Bandwidth and Peerless facilitated the transmission of robocall campaigns and or calls from the telemarketer and or seller to Plaintiff's cell number whereas the robo callers:

(a) Misrepresented material aspects of goods or services, in violation of 16 C.F.R. 310.3(a)(2)(iii);

(b) Misrepresented the seller's or telemarketer's affiliation with corporations or government entities, in violation of 16 C.F.R 310.3(a)(2)(vii);

(c) Made false or misleading statements to induce any plaintiff to pay for goods or services, in violation of 16 C.F.R 310.3(a)(4);

(d) Failed to transmit or cause to be transmitted the real telephone number and the name of the telemarketer to caller identification services used by call recipients, in violation of 16 C.F.R. 310.4(a)(8);

(e) Initiated or caused the initiation of outbound calls to a telephone number of the DNCR, in violation of 16 C.F.R. 310.4(b)(1)(iii)(B);

(f) Initiated or caused the initiation of outbound telephone calls that delivered prerecorded messages in violation of 16 C.F.R. 310.4(b)(1)(v); and/or

(g) Failed to disclose the identity of the seller of the goods or services truthfully, promptly, and in a clear and conspicuous manner to the plaintiff who was receiving the robocall , in violation of 16 C.F.R 310.4(d)(1).

**53.** Onvoy, Bandwidth and Peerless provide tailored and or customized VoIP services to the needs of robocalling customers by enabling them to place a high volume of calls in quick succession, billing only for the duration of completed calls—typically in as little as 6-second increments— and ignoring clear indicia of illegal call traffic.

Defendants provided their customers with Direct Inward Dialing numbers ("DIDs"), which would appear to the persons receiving the calls as the calling numbers or "Caller IDs."

**54.** This service was likely provided to circumvent the procedural guardrails of the caller authentication framework of STIR/SHAKEN[8] that would otherwise mark a randomly generated or used calling number as "unverified" and cause such calls to be blocked from being delivered to the called party at a network level by a downstream provider.

**55**. Defendants have quick and inexpensive access to millions of DIDs that they sell or lease to their cu Defendants sold DIDs in bulk and were capable of providing DIDs for telephone numbers from every area code in the United States.

**56**. The practice of "spoofing" is used deceptively by scammers to manipulate the caller ID system, so it appears that their calls are from legitimate phone numbers.

Defendants used DIDs for "neighbor" spoofing and/or "snowshoe" spoofing. Neighbor spoofing is the practice of using caller ID numbers with the same area code and same or similar three-digit exchange as the call recipient to increase the odds of the call recipient answering the call due to the belief that the call is originating from the local area. Snowshoe spoofing is the practice of using massive quantities of unique numbers for caller ID on a short-term or rotating basis to evade behavioral analytics detection, or to bypass or hinder call blocking or call labeling analytics based on the origination numbers. **57**. Numbers used for snowshoeing are often numbers that cannot receive incoming calls. Defendants actively participated in the initiation of, or assisted and facilitated in the initiation of, illegal robocalls that Plaintiff received.

**58.** Defendants Onvoy, Peerless and Bandwidth assisted and facilitated illegal robo calls that used neighbor spoofing when calling plaintiff.  Upon information and belief, another

---

[8] STIR/SHAKEN is a framework of FCC-mandated processes and procedures that enables phone companies to verify that the Caller ID information transmitted to the call recipient matches the caller's real phone number, and is intended to stop or significantly mitigate illegal and fraudulent Caller ID spoofing. See FCC, Caller ID Authentication Tools, https://www.fcc.gov/TRACEDAct (

manner of the spoofing is accomplished where the VoIP provider, i.e. Onvoy, Bandwidth and Peerless, taps into the phone line of a active Onvoy, Bandwidth or Peerless phone customer and uses that person's phone number to facilitate a outbound robo call.

**59**. Defendants Onvoy, Peerless and Bandwidth provided substantial support and assisted sellers and telemarketers engaged in illegal robocalling in many ways, including but not limited to

(a) making and/or routing their customers' and robocallers' illegal calls to Plaintiff's cell number;

(b) upon information and belief, taking express steps to obscure the ownership of at least one of their customers and or telemarketers from ITG and other third parties after the principal owner became the subject of federal and state law enforcement actions and formed another named entity to continue to conduct business under another entity name;

(c) providing some customers and or telemarketers with DID rotation support, so that the customer could circumvent and undermine consumer, law enforcement, and industry efforts to block and mitigate illegal calls

(d) providing customers and or telemarketers with the telephone numbers (DIDs or Caller IDs) used to make illegal calls to Plaintiffs' cell number;

(e) providing customers and or telemarketers with leads and/or data used by their customers to make illegal calls to Plaintiff's cell number; and

(f) providing customers, sellers and or telemarketer's with expertise on how to most effectively and profitably run their illegal robocalling and telemarketing schemes.

**60**. Without the support, assistance, facilitation, and participation of Defendants, the illegal robocalls sent by and through their network would not have reached Plaintiff cell phone over 700 times this year and growing daily.

**61**. Along with the basic functions of a VoIP carrier, Defendants Bandwidth, Peerless, Onvoy and Berken do a lot more. Rather than just provide VoIP access, these Defendants create the content for the telemarketing campaigns they operate through their network. For example, Onvoy's parent company, Sinch, provides is artificial voice services to its clients. On its website, Sinch admits it provides templates for these artificial voice bots and states in response to a FAQ asking, "How do I build a good bot?" Sinch's answer: We've got a lot of experience with bot design and are happy to share the wealth. When you log in to the platform, you'll find best-practice templates to guide you. You can use these or adapt them as you live – no additional cost

**62**. It also advertises programable Voice API "that reaches customers on any platform or channel . . . Enjoy a high-quality voice experience, optimized delivery routes, and a carrier super network – all in one place." Sinch also advertises on its website "call recording", creating pre-recorded messages for "customized online phone conversations," "text-to-speech," "number masking" (which prevents Caller ID from identifying the caller), and a "local presence" by assigning numbers to its customers that have the same area codes as the people their customers are trying to reach. [9] Sinch also advertises its text messaging services on its website.

**63**. Upon information and belief, Onvoy, Peerless and Bandwidth control the voice message template used as the template for the robocall, creates the artificial voice on the

---

[9] https://www.sinch.com/products/apis/voice-calling/ (last visited October 11, 2023)

robocall, places the robocall to a recipient's cell phone using its VoIP network, is fully aware that its customers are using its platform to engage in activity that violates the TCPA and many other laws.

**64**. Peerless, Bandwidth and Onvoy also control which telephone users receive the prerecorded message or artificial voice when the call is placed through its automated system for selecting and dialing telephone numbers. This is apparent because they do not target a specific audience with their robocalls – they seem to call everyone. The DNCR does not apply to these Defendants. For example, these Defendants have sent hundreds of illegal robocalls to Plaintiff related to a "Medicare advisory services", yet Plaintiff is not on Medicare, not even close to applying for Medicare. He also has received final burial expense  calls from Defendants, but Plaintiff has not sought burial insurance. Plaintiff also receives a substantial number of calls offering him car warranty products and accident claim/legal services from Berken.  Plaintiff has not sought or requested any of these services. Not to mention the scam robo calls impersonating government entities and Amazon scam calls.

**65**. Upon information and belief, over a period of years, Defendants have received many notices, inquiries, warnings, complaints concerning fraudulent robocalls and other suspicious activity occurring on their systems. These warnings and inquiries came from other consumers and lawsuits filed against them, an industry trade group, and government agencies. Nevertheless, Defendant Onvoy continue to enable these telemarketing schemes by placing calls for other telemarketers/sellers using their VoIP technology  For instance, On May 10, 2022, Inteliquent, parent company of Onvy was ordered by the

Federal Trade Commission to cease and desist from transmitting illegal robocall traffic. See Exhibit B

**66**. On March 17, 2023, the FTC ordered Peerless to also cease and desist from transmitting illegal robocall traffic. See Exhibit. C

**67.** Upon information and belief, some of the numbers that Defendant Onvoy, Peerless and Bandwidth have used to call Plaintiff are now assigned to different telephone carriers and or sellers. Rather than shutting down illegal telemarketing practices on its network that it essentially created, Defendants merely sell, license or otherwise transfer the numbers to different companies (Commio, LLC, AirUS, Inc, MCI Metro, NUSO, LLC etc) that have no idea these numbers are used as part of telemarketing practices that violate the TCPA. But the discovery process in these proceedings will reveal the truth.

**68**. Peerless is listed in the FCC's Robo call Mitigation Database.[10] Peerless certifies "that all voice traffic that originates on its network is authenticated with STIR/SHAKEN, consistent with 47 CFR § 64.6301(a)." Id.

**69**. Onvoy LLC is also listed on the FCC's Robo call mitigation Database.[11] Onvoy refers that they are the direct and or indirect parent of the entities, i.e. Sinch America Inc. Inteliquent, Inc among others listed. Onvoy also refers that they have a "Know your Customer Team" comprised of multiple employees ….to test before it allows a party to become a new customer. Apparently that test failed systemically when compared to the

---

[10] The FCC requires all voice service providers to file certifications in the publicly accessible Robocall Mitigation Database regarding their effort to fight illegal robocalls on their respective networks. See FCC, Robocall Mitigation Database:
https://fccprod.servicenowservices.com/rmd?id=rmd_form&table=x_g_fmc_rmd_robocall_mitigation_database&sys_id=f063bbeb1be7e4102eb2a82fe54bcbf1&view=sp (last visited October 12, 2023)

[11]
https://fccprod.servicenowservices.com/rmd?id=rmd_form&table=x_g_fmc_rmd_robocall_mitigation_database&sys_id=3224ae321be87c10822320efe54bcbcb&view=sp

700 plus illegal robo calls that Onvoy, Bandwith and Peerless  facilitated and or allowed

to Plaintiff's cell number while being on the DNCR.

**70**. Listed Below are just a few of the over 700 seven-hundred robo/spoofed/pre-recorded

calls that Plaintiff has kept record of since January 4, 2023.

| 1 | 4-Jan-23 | 9:35 AM | 1-971-299-2477 | Onvoy LLC-OR | Medicare robo call -recorded |
|---|---|---|---|---|---|
| 2 | 4-Jan-23 | 12:36 PM | 1-832-619-1466 | Spoofed CID | Pre-Recorded voice message From Jason w/ Medicare - recorded |
| 3 | 4-Jan-23 | 4:34 PM | 1-832-633-3066 | Spoofed CID | Medicare robo call -recorded |
| 4 | January 5, 2023 | 1:21 PM | 1-832-768-2667 | Spoofed CID | Pre-Recorded voice message From Mary  w/ Final Expense |
| 5 | January 5, 2023 | 3:12 PM | 832-462-5897 | Aerial | Pre-Recorded voice message From Emma w/ Final Expense |
| 6 | January 10, 2023 | 10:16 AM | 832-740-9597 | Sprint | Pre-Recorded voice message From Emma w/ Final Expense |
| 7 | January 10, 2023 | 4:39 PM | 1-832-644-0711 | Level 3 Comm | Robo call from Medicare - recorded |
| 8 | January 10, 2023 | 4:44 PM | 1-832-689-5285 | Spoofed CID | Pre-Recorded Message from Medicare recorded |
| 9 | January 17, 2023 | 12:52 PM | 1-601-374-7922 | Onvoy LLC | Pre-Recorded Message from Medicare recorded |
| 10 | January 18, 2023 | 10:59 AM | 1-832-681-4035 | Spoofed CID | Pre-Recorded voice message From Sophia - Accident Claims |
| 11 | January 19, 2023 | 8;41 AM | 1-832-703-4363 | Sprint | Pre-Recorded voice message From Emma w/ Final Expense |
| 12 | January 20, 2023 | 1:16 PM | 1-832-622-5926 | Spoofed CID | Pre-Recorded voice message From Emma w/ Final Expense |
| 13 | January 20, 2023 | 3:37 PM | 1-832-643-6080 | Spoofed CID =Aerial | Pre-Recorded voice message from Sophia Accident Claims - recorded |

| 14 | January 21, 2023 | 12:39 PM | 1-832-694-4915 | | Robo call from Mark at Solar Panel |
| 15 | January 23, 2023 | 9:58 AM | 1-432-233-1279 | Onvoy LLc-Tx | Pre-Recorded voice message from Elsa w/Medicare - recorded |
| 16 | January 23, 2023 | 1:52 PM | 1-832-693-3923 | Spoofed CID | Pre-Recorded voice message from Sophia - Acc. Claims - recorded |
| 17 | January 23, 2023 | 2:06 PM | 1-832-659-8782 | Spoofed CID | Pre-Recorded voice message From Alex w/ Final Expense -recorded |
| 18 | January 23, 2023 | 5:22 PM | 1-770-273-7756 | Onvoy LLC-GA | Pre-Recorded voice message from Medicare robo |
| 19 | January 24, 2023 | 1:06 PM | 1-832-590-5550 | SWBell | Pre-Recorded voice message from Alex w/Final Expense-recorded |
| 20 | January 24, 2023 | 2:52 PM | 1-832-224-3712 | Bandwidth.com | |

## Call Detail Records

**71.** Every attempted or completed call that reaches a VoIP provider's network automatically generates a record, known as a "call detail record" or "CDR," which generally includes the following information:

(a) The date and time of the call attempt;

(b) The duration of the call (calls that fail to connect are generally denoted by a zero-second duration);

(c) The intended call recipient's telephone number;

(d) The originating or calling number from which the call was placed (which may be a real number or may be spoofed);

(e) An identifier such as a name or account number for the upstream provider that sent the call attempt to the VoIP provider's network; and

(f) An identifier for the downstream provider to which the VoIP provider attempts to route the call.

**72**. Since VoIP providers use these CDRs for billing purposes, they are incentivized to ensure that the CDRs are complete and accurate. Pre-trial discovery should reveal an enormous amount of evidence against these TCPA violators that the jury can visualize and understand these Defendant's liability.

**73.** CDRs are maintained for some amount of time by every provider in order to, at a minimum, accurately bill an upstream provider for accepting and routing its call traffic Illegal robocalls create distinctive and identifiable patterns in CDRs. These calls are universally unexpected and unwanted, so most recipients hang up the phone immediately. Therefore, these calls typically connect for a very short duration, if at all. CDRs for illegal robocalls will often feature a high percentage of calls that are only a few seconds long. When examined in the aggregate, CDRs tend to show a very short average call duration.

**74**. Conversely, CDRs showing legitimate, consented-to robocalls or routine conversational call traffic typically have a much lower short call percentage, and a much longer average call duration.

**75.** Also, improper or questionable Caller ID spoofing—where a calling number is used relatively infrequently in relation to the total number of calls that are made with that number—is often apparent in CDRs and is indicative of illegal robocalls. Robocallers deceptively use spoofing to hide their identity, to circumvent call blocking and labeling tools, and to make it more likely that Plaintiff will answer their calls, as he has answered such calls and quite strangely and eerie, are very similar to phone numbers of friends and

family members.    Upon information and belief, these Defendants have "illegally" accessed Plaintiff's contacts to clone and or duplicate similar numbers to spoof them.

76. Illegal robocallers frequently use caller ID spoofing to impersonate trusted organizations such as law enforcement, government agencies, and large corporations.

77. These organizations' phone numbers are publicly available, and when these numbers appear in CDRs for calls that originate abroad, these robocalls are irrefutably illegal.

78. Patterns of neighbor spoofing or impersonating trusted numbers are easy to detect when present in CDRs and indicate that the upstream provider is sending illegal calls across the downstream provider's network

79. Another identifier of illegal robocalls captured by CDRs is the presence of high numbers of unique calling phone numbers initiating calls. This technique of using a calling number only a handful of times to avoid detection by call blocking analytics is called "snowshoeing" or using "disposable" phone numbers.

80. As described above, illegal robocallers and telemarketers use the "snowshoeing" method of spoofing—using a calling number only once or a handful of times to avoid detection—to prevent large providers and legitimate companies from identifying and blocking the phone numbers the bad actors are using to perpetrate scam calls.

81. The presence of high rates of calls to phone numbers on the DNCR is another way to distinguish illegal robocalls and telemarketing calls from legitimate calls. Substantial volumes of illegal calls are placed to phone numbers on the DNCR because problematic robocallers are unlikely to respect legal prohibitions on calling numbers on the DNCR.

## PLAINTIFF'S FACTUAL ALLEGATIONS

**82**. On January 5, 2023, the intrusive, annoying, disruptive, deceptive and harassing robo calls started to get logged and recorded. A telemarketing campaign of pre-recorded messages and spoofed caller ID"s from Defendant NISHD, in the company of Bandwidth, Peerless, Onvy and Berken Media commenced relentlessly about final expense, diabetic services, United States Customs, Amazon scams, Solar services, accident legal/claims and medicare services and also masquerading as "senior benefits."

**83.** Plaintiff, is a full-time remote worker in the recovery financial industry. During his work hours, from 8:00 am thru 6:00 pm, is when the barrage of illegal robo calls have transpired, with the occasion weekend robo calls.

**84**. At all times relevant, Plaintiff owned a cell phone, the number for which was 832-XXX-7311(hereinafter cell-phone") and utilized this phone number ending in 7311 as a personal, household and family cellular telephone on a daily & continuous basis.

**85.** Plaintiff's 7311 number has been registered with the national DNCR since September 29, 2011 and at all times relevant to this action. *See Exhibit A.* Plaintiff subsequently checked with the website verify@donotcall.gov to further confirm that his cell number was still registered with the do-not- call governmental registry.

**86**. At the direction of Defendant NISHD, Onvoy, Bandwidth, Peerless and unknown telemarketing and 3rd party sellers and or telemarketers directed by Defendant NISHD have placed a "multitude" of unsolicited, intrusive & harassing final expense, diabetic services, accident claims, solar and US Customs scam calls and medicare robo spoofed calls and or text messages to Plaintiff on his personal cellular phone for solicitation purposes.

**87.** Plaintiff did not request any type of information from any of the named Defendants herein or third parties directed by Defendant NISHD about medicare, final expense/burial services or products, accident claims. Solar, and electricity products. NISHD did not have any type of consent to contact Plaintiff on a consistent & harassing basis nor any prior business relationships exist.

**88**. Plaintiff was *not interested* in purchasing any type of medicare, diabetic services, accident claim legal services and or final expense/low cost burial insurance products and or services from any of these named Defendants.

**89**. Defendant's seven-hundred (700) plus intrusive and harassing pre-recorded robo and spoofed phone calls were transmitted to Plaintiff's cellular telephone, and within the time frame relevant to this action.

**90**. Defendant's seven-hundred (700) plus intrusive robo-calls constitute telemarketing because they encouraged the future and or present purchase or investment in property, goods, or services, i.e. selling this Plaintiff final expense/low cost burial insurance, medicare services, accident legal services, solar, Electricity and Diabetic services.

**91.** Defendant's seven-hundred (700) spoofed/pre-recorded robo calls were not made for "emergency purposes."

**92**. Plaintiff received the subject pre-recorded robo-calls and spoofed robo-calls within this judicial district and, therefore, Defendant's violation of the TCPA occurred within this district.

**93.** Defendant's pre-recorded robo and or spoofed robo calls/texts were not made for an emergency purpose or to collect on a debt pursuant to 47 U.S.C. § 227(b)(1)(B)

**94**. Upon information and belief, Defendant NISHD or Berken Media do not have a written policy for maintaining an internal do not call list pursuant to 47 U.S.C. § 64.1200(d)(1).

**95**. Upon information and belief, Defendant NIHSD or Berken Media do not inform and or train its personnel (marketing staff members) engaged in telemarketing in the existence and the use of any internal do not call list pursuant to 47 U.S.C. § 64.1200(d)(2).

**96**. At no point in time did Plaintiff provide any of the named Defendants with his express written consent to be contacted twice or more daily during Plaintiff's work week.

**97**. Plaintiff is the subscriber and sole user of the cell-phone number and is financially responsible for phone service to the cell-number.

**98**. On July 14, 2023 – Plaintiff received a robo spoofed call from a rookie telemarketer with a spoof caller ID # of 832-514-6886 (call recorded).  Plaintiff provided personal information to the robo telemarketer for the sole purpose to discover who the elusive TCPA violator was.  Plaintiff had previously attempted an estimated 47 times to get to a verifier & scheduler, but these efforts were futile.

**99**. On July 15, 2023, Plaintiff received a call-back (recorded) to his cell-phone from insurance agent Ashley Johnson ("Johnson"), who is a licensed State of Texas insurance agent General Lines Agent # 2896442. Plaintiff set up an appointment with Johnson at his home to discover the continuous & elusive violator of the DNCR to Plaintiff's cell number.

**100**. On July 18, 2023, Plaintiff discovered who the TCPA corporate violator was, being Defendant NISHD upon reading the Individual Life Insurance Application underwritten by United of Omaha Life Insurance Company.  See Exhibit  D at pg. 7.  The name of

NISHD clearly and accurately shows as the General Agent/General Manager Name on this application.

**101.** Defendant NISHD, a corporate entity is a stranger to TCPA litigation within the federal court system.

**102**. The TCPA's implementing regulation, 47 C.F.R. § 64.1200(c), provides that "[n]o person or entity shall initiate any telephone solicitation" to "[a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the federal government.

**103**. Many times has Aguilar (recorded calls) stated to the heavily accented and or foreign Final Expense, Medicare and Accident Claims telemarketing reps to remove Plaintiff from their calling list, to stop calling, opt-him-out from the call lists but still the intrusive, disruptive and harassing robo calls continue daily (700 plus illegal robo calls) at the time of the filing of this lawsuit.

**104**. Defendant's unsolicited robo-calls caused Plaintiff actual harm, including invasion of his privacy, aggravation, annoyance, intrusion on seclusion, trespass, and conversion during Plaintiff's work week. Defendant's harassing and abusive robo calls have caused a disruption to his daily life activities, anxiety and emotional distress when his cell phone rings.

## COUNT I
## DEFENDANT VIOLATED THE TCPA 47 U.S.C. § 227( b )
## Telemarketing in Violation of the TCPA's Do-Not-Call Provisions

**105**. Plaintiff incorporates the forgoing paragraphs 1-81 as though the same were set forth at length herein.

**106**. The TCPA's implementing regulation, 47 C.F.R. § 64.1200(c), provides that "[n]o person or entity shall initiate any telephone solicitation" to "[a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the federal government."

**107**. 47 C.F.R. § 64.1200(e), provides that § 64.1200(c) and (d) "are applicable to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers."

**108**. 47 C.F.R. § 64.1200(d) further provides that "[n]o person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity."

**109.** Any "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may" may bring a private action based on a violation of said regulations, which were promulgated to protect telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object. 47 U.S.C. § 227(c).

**110**. Defendant's calls to Plaintiff were not made for "emergency purposes."

**111**. The seven-hundred (700) plus robo calls allowed and or facilitated by the named Defendants herein, have been intrusive, disruptive, aggravating & such pre-recorded and spoofed robo calls to Plaintiff's cellular telephone were initiated without any prior express consent.

**112**. Named Defendant's herein violated 47 C.F.R. § 64.1200(c) by initiating, or causing to be initiated, telephone solicitations to telephone subscribers such as Plaintiff who registered his respective telephone numbers on the National DNCR, since September 2011.

**113**. Named Defendants herein violated 47 U.S.C. § 227(c)(5) because Plaintiff received more than one telephone call and or robo-text message(s) in a 12-month period made by or on behalf of Defendant in violation of 47 C.F.R. § 64.1200, as described above. As a result of Defendant NISHD conduct as alleged herein, Plaintiff suffered actual damages and, under section 47 U.S.C. § 227(c), are entitled, inter alia, to receive up to $500 in statutory damages for each illegal robo and spoofed call in violation of 47 C.F.R. § 64.1200; 47 U.S.C. 227( c) (5).

**114.** The acts and/or omissions of Defendant were done unfairly, unlawfully, intentionally, deceptively and fraudulently and absent bona fide error, lawful right, legal defense, legal justification or legal excuse.

**115**. To the extent of the named Defendant's misconduct is determined to be willful and knowing, the Court should, pursuant to 47 U.S.C. § 227(c)(5), treble the amount of statutory damages. Further, named Defendants are liable for these violations either directly and through the principles of ratification, as joint venturers, or by knowingly engaging in a conspiracy to make and or facilitate illegal robo calls to Plaintiff in violation of the TCPA.

## COUNT II
## DEFENDANT VIOLATED THE TCPA 47 U.S.C. § 227(C)

**116**. Plaintiff incorporates the forgoing paragraphs 1-81 as though the same were set forth at length herein.

**117.** The TCPA prohibits any person or entity of initiating any telephone solicitation to a residential telephone subscriber who has registered his or her telephone number on the National DNCR of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government. 47 U.S.C. § 227(c).

**118**. Defendant NISHD contacted Plaintiff despite the fact that Plaintiff has been on the Do Not Call Registry since 2011. See Exhibit A As of date, Plaintiff still maintains his cell number on the Do-Not-Call Registry.

**119**. Defendants have facilitated and or initiated robocalls to Plaintiff on two or more occasions during a single calendar year despite Plaintiff's registration on the DNCR list.

**120**. Under 47 C.F.R. § 64.1200(d), "[n]o person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity. The procedures instituted must meet certain minimum standards, including:

**(3**) Recording, disclosure of do-not-call requests. If a person or entity making a call for telemarketing purposes (or on whose behalf such a call is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not call list at the time the request is made. Persons or entities making calls for telemarketing purposes (or on whose behalf such calls are made) must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made. This period may not exceed thirty days from the date of such request . . .

(**6**) Maintenance of do-not-call lists. A person or entity making calls for telemarketing purposes must maintain a record of a consumer's request not to receive further telemarketing calls. A do-not-call request must be honored for 5 years from the time the request is made.

47 C.F.R. § 64.1200(d)(3), (6)

**121**. The acts and/or omissions of named Defendant's herein were done unfairly,

unlawfully, intentionally, deceptively and fraudulently and absent bona fide error, lawful

right, legal defense, legal justification or legal excuse.

**122**. Under 47 C.F.R § 64.1200(e) the rules set forth in 47 C.F.R. § 64.1200(d) are

applicable to any person or entity making telephone solicitations or telemarketing calls to

wireless telephone numbers:

(**e**) The rules set forth in paragraph (c) and (d) of this section are applicable to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers to the extent described in the Commission's Report and Order, CG Docket No. 02-278, FCC 03-153, "Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991

47 C.F.R. § 64.1200(e).

**123**. Plaintiff made requests to named Defendant's herein agents, subcontractors, representatives, servants not to receive any more phone calls.

**124.** Named Defendant's herein failed to honor Plaintiff's requests on two or more separate occasions.

**125**. Because Plaintiff received more than one robo call in a 12-month period made by

or on behalf of named Defendants' in violation of 47 C.F.R. § 64.1200(d), as described

above, Defendants violated 47 U.S.C. § 227(c)(5).

**126**. As a result of named Defendant's violations of 47 U.S.C. § 227(c)(5), Plaintiff is

entitled to an award of $500.00 in statutory damages, for each and every negligent

violation, pursuant to 47 U.S.C. § 227(c)(5).

**127**. As a result of named Defendant's violations of 47 U.S.C. § 227(c)(5), Plaintiff is entitled to an award of \$1,500.00 in statutory damages, for each and every knowing and/or willful violation, pursuant to 47 U.S.C. § 227(c)(5).

**128**. Plaintiff  also suffered damages in the form of invasion of privacy.  Moreover, Plaintiff is on the State of Texas Do Not Call List.  See Exhibit E.

**COUNT III**
**DEFENDANT VIOLATED § 302.101 OF**
**THE TEXAS BUSINESS & COMMERICAL CODE**

**129**. Plaintiff incorporates the forgoing paragraphs 1-81 as though the same were set forth at length herein.

**130**. §302.101 of the Texas Business & Commerce Code prohibits sellers from engaging in telephone solicitation from a location in this state or to a purchaser located in this state unless the seller obtains a registration certificate from the Office of the Secretary of State for the business location from which the solicitation is made.

**131.** Named Defendants, sellers, telemarketers  violated § 302.101 of the Texas Business & Commercial Code when its representatives engaged in continuous and repetitive telephone solicitation of Plaintiff without obtaining a registration certificate from the Office of the Secretary of State.

**132**. §302.302(a) of the Texas Business & Commerce Code provides that a person who violates this chapter is subject to a civil penalty of no more than \$5,000 for each violation. Furthermore, §302.302(d) provides that the *party* bringing the action is also entitled to recover all reasonable cost of prosecuting the action, including court costs and investigation costs during discovery, deposition expenses, witness fees that will be required and needed upon the trial before a jury.

## COUNT IV
## DEFENDANTS ONVOY, PEERLESS, BANDWIDTH, BERKEN MEDIA & NISHD HAVE CAUSED INTENTIONAL INFLICTION OF MENTAL ANGUISH AND/OR EMOTIONAL DISTRESS UPON PLAINTIFF

**133.** Plaintiff incorporates the forgoing paragraphs 1-81 as though the same were set forth at length herein.

**134.** Defendant NLSHD, Onvoy's, Bandwidth, Peerless and Berken's unlawful conduct as previously described in this complaint was systemically known to these TCPA violators that such egregious conduct would provide and did produce damages in anxiety, mental anguish and or emotional distress to this individual plaintiff herein. As a direct and proximate result of these Defendant TCPA abusers, such callous conduct has caused Plaintiff to suffer emotional distress and emotional damage that the jury in this case should determine. Defendant's callous disregard and egregious conduct as precisely described herein has been outrageous, wholly without legal or factual justification, such conduct was carried out in a malicious and wanton scheme to further their profits at a corporate level, thus, Plaintiff should be allowed to recover punitive damages herein from each named Defendant.

**Wherefore**, Plaintiff, **Timothy Plaintiff,** respectfully prays for judgment as follows:

a. All actual damages Plaintiff suffered (as provided under 47 U.S.C. § 227(b)(3)(A)) and §302.302 of the Texas Business and Commerce Code

b. Statutory damages of $500.00 per violative telephone call (as provided under 47 U.S.C. § 227(b)(3)(B));

c. Additional statutory damages of $500.00 per violative telephone call (as provided under 47 U.S.C. § 227(C);

d. Treble damages of $1,500.00 per violative telephone call (as provided under 47 U.S.C. § 227(b)(3));

e. Additional treble damages of $1,500.00 per violative telephone call (as provided under 47 U.S.C. § 227(C);

f. Injunctive relief (as provided under 47 U.S.C. § 227(b)(3) and (c)

g. Statutory damages of $5,000 per violation (as provided under §302.302(a) of the Texas Business & Commerce Code);

h. All reasonable  witness fees, court costs and other litigation costs incurred by Plaintiff pursuant to §302.302(a) of the Texas Business & Commerce Code;

i. Any other relief this Honorable Court deems appropriate

**DEMAND FOR JURY TRIAL**

**Please take notice** that Plaintiff, **Timothy Aguilar,** demands a jury trial in this case

## DOCUMENT PRESERVATION DEMAND

Plaintiff demands that each of the named Defendant's named herein take affirmative steps to preserve all records, lists, electronic databases or other itemizations associated with the allegations herein, including all records, lists, electronic databases including  Workforce Management software, CCaaS, IVR, Oracle, Speech Analytic, Five9, Genesys, Talkdesk or other itemizations in the possession of any vendors, sellers, telemarketers, individuals, and/or companies contracted, hired, or directed by Defendant to assist in making the robo calls to Plaintiff named herein.  These Defendants have previously been noticed to preserve evidence relating to this upcoming litigation.

Respectfully submitted,

Timothy Aguilar, Pro Se
2807 Randolph Road
Pasadena, Texas 77503
proselitigationx@gmail.com