**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **TIMOTHY AGUILAR,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO.  4:23-cv-3988** |
| | § | |
| **NETWORK INSURANCE SENIOR** | § | |
| **HEALTH DIVISION ALG, LLC,** | § | |
| **ONVOY LLC, BANDWIDTH, INC.,** | § | |
| **PEERLESS NETWORK, INC., &** | § | |
| **BERKEN MEDIA LLC,** | § | |
| | § | |
| **Defendants.** | § | |

**DEFENDANT NETWORK INSURANCE SENIOR HEALTH DIVISION ALG, LLC'S**
**ANSWER AND AFFIRMATIVE DEFENSES**

Defendant, NETWORK INSURANCE SENIOR HEALTH DIVISION ALG, LLC,

("NETWORK"), pursuant to Fed. R. Civ. P. 8 and 12 answers Plaintiff's Complaint (Doc. 1) (the

"Complaint") as follows:

## I.       FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

The Complaint fails to allege facts sufficient to state a cause of action against NETWORK.

Rule 12(b)(6) provides for dismissal where a plaintiff fails to sufficiently state a claim for relief.

It is axiomatic that a legal claim brought in federal court mandates the pleading of sufficient facts.

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-557 (2007).  A "bare assertion" and "conclusory

allegation[s]" will not suffice. *Id*.  Allegations without such factual enhancements "stop [] short of

the line between possibility and plausibility of entitlement to relief."  *Id*. (internal quotations

omitted).  A "formulaic recitation of elements" of a claim also fails to meet the requisite pleading

standard and does not suffice to avoid dismissal.  *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009); *see

also id.* at 678 (pleadings must contain "more than an unadorned, the-defendant-unlawfully-

harmed-me accusation").  Further, "although all reasonable inferences will be resolved in favor of

the plaintiff, the plaintiff must plead "specific facts, not mere conclusory allegations" to avoid

dismissal.  *Pelayo v. Wells Fargo Bank, N.A.*, 2014 WL 3513207, at *2 (W.D. Tex. July 14, 2014)

(quoting *Tuchman v. DSC Commc'ns Corp.*, 14 F. 3d 1061, 1067 (5th Cir. 1994)).

Here Plaintiff's Complaint consists largely of quotes from statutes, Congressional findings,

websites, and other unknown sources of "authority."  The "facts" that are contained within the

Complaint are conclusions, assumptions, speculation, and seemingly intermingled acts of other

Defendants or unknown third-parties without any clear delineation of what NETWORK did to

harm the Plaintiff.

## II.    ANSWER

NETWORK responds to Plaintiff's specific allegations in the Complaint as follows:

### Summary of the Case

1.     Plaintiff's Complaint is filed upon the Telephone Consumer Protection Act

("TCPA"), 47 U.S.C. §227 et. seq.

**RESPONSE**: NETWORK denies Plaintiff has stated a claim against NETWORK under

the TCPA.

2.     As the Supreme Court has explained, "Americans passionately disagree about

many things. But they are largely united in their disdain for robocalls.  The Federal Government

receives a staggering number of complaints about robocalls – 3.7 million complaints in 2019 alone.

The States likewise field a constant barrage of complaints.  For nearly 30 years, the people's

representatives in Congress have been fighting back.  As relevant here, the Telephone Consumer

Protection Act of 1991, known as the TCPA, generally prohibits robocalls to cell phones and home

phones."  *Barr v. Am. Ass'n of Political Consultants*, 140 S. Ct. 2335, 2343 (2020).  The TCPA

2

and its accompanying regulations prohibit named Defendants from making telephone solicitations to persons who have listed their telephone numbers on the national Do Not Call Registry (hereinafter "DNCR"), a database established to allow consumers to exclude themselves from telemarketing calls, which include text messages, unless they consent to receive the calls in a signed, written agreement.  The TCPA also prohibits Defendants from making telephone calls to persons that feature a prerecorded or artificial voice without the prior express consent of the party called.  Named Defendants have chosen to knowingly, willfully and without a callous disregard, ignore the meaning of the TCPA and feel that they are above the law.

**RESPONSE**:  NETWORK admits that the allegations contained in the first sentence are a quote from the Supreme Court's opinion in *Barr v. Am. Ass'n of Political Consultants.*  Network denies the allegations contained in the second, third, and fourth sentences.

3.     Plaintiff is one individual out of the millions that have registered their numbers on the national DNCR. Nevertheless, Plaintiff has received over seven-hundred (700) illegal robo/telemarketing calls at the time of filing this Complaint.  A majority of the robo calls being transmitted by Onvoy LLC, Peerless Network and Bandwidth and other VolP service providers.

**RESPONSE**:   NETWORK lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first and second sentences.  NETWORK denies the allegations as to it in the third sentence.

4.     Plaintiff has been harassed, cussed at, victimized by the hundreds of illegal telemarketing robo calls made by Defendants, including without limitation the robocalls soliciting car warranties, medical and diabetic services, final expense services, home solar products, accident claim legal services.  This case evolves from a campaign by NISHD to market its services and or products through the use of pre-recorded telemarketing calls in plain violation of the TCPA, to

3

which Bandwidth, Peerless and Onvoy have initiated and or facilitated with their VoIP call services technology.

**RESPONSE**:  NETWORK denies these allegations.

5.     Plaintiff has received over seven-hundred (700) illegal robo calls with a high percentage of robo calls being phone recorded by Plaintiff to be presented at trial herein.  Plaintiff is entitled to damages under the TCPA from each individual named Defendants herein.  NISHD has engaged in improper and deceptive telemarketing practices by placing improper and unwanted telemarketing calls to Plaintiff on a daily basis.  To promote its services and solicit new clients, NISHD has engaged in a telemarketing campaign to send harassing, robo calls soliciting final expense and medicare services to Plaintiff without proper consent and or any type of previous business relationship.

**RESPONSE**: NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence.   NETWORK denies the allegations contained in the second, third, and fourth sentences and that it engages in improper and deceptive telemarketing practices or engages in campaigns to market its services or products through use of robocalls.

6.     To generate leads, regardless of violating federal law, NISHD has hired TCPA violators Onvoy, Bandwidth and Peerless to initiate and promote calls to Plaintiff and attempt to persuade him to schedule an appointment or provide personal information to their telemarketers to further their scheme.

**RESPONSE**:  NETWORK denies these allegations.

7.     At the time of these over seven-hundred (700) telemarketing calls made, facilitated, initiated and or assisted by Defendants Onvoy, Peerless and Bandwidth, including without

limitation robocalls offering Plaintiff car warranties, medical services, final expense services, Medicare services, home solar, IRS, accident claim legal services and many other scams, Plaintiff was on the DNCR since about 2011.

**RESPONSE**:  NETWORK denies these allegations.

## Jurisdiction and Venue

8.      This Court has subject-matter jurisdiction over the TCPA claims in this action under 28 U.S.C. §1331 which grants this court original jurisdiction of all civil actions arising under the laws of the United States, *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 386-87 (2012) (confirming that 28 U.S.C. §1331 grants the United States district courts federal question subject-matter jurisdiction to hear private civil suits under the TCPA).

**RESPONSE**:  NETWORK admits the allegations for jurisdictional purposes only, and denies that Plaintiff is entitled to the relief that he seeks.

9.      This Court has personal jurisdiction over named Defendants herein who conduct business in the State of Texas.

**RESPONSE**:  NETWORK admits the allegations for jurisdictional purposes only, and denies that Plaintiff is entitled to the relief that he seeks.

10.      Venue is proper under 28 U.S.C. §1391(b)(2).

**RESPONSE**:  NETWORK admits as to venue only, and denies that Plaintiff is entitled to the relief that he seeks.

## Parties

11.      Plaintiff is a natural person residing in Pasadena, Texas, 77503. Plaintiff has been the exclusive user of telephone number 832-XXX-7311.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

12.      Plaintiff is a "person" as the term is defined by 47 U.S.C. §153(39).

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

13.      Defendant NISHD is a business entity with principal place of business, head office, or otherwise valid mailing address at 2650 McCormick Drive, Suite 200S, Clearwater, Fl. 33759.

**RESPONSE**:  NETWORK admits these allegations.

14.      NISHD's Registered Agent for Service of Process: Corporation Service Company d/b/a CSC-Lawyers Incorporating Services Company – 211 East 7th Street, Suite 620, Austin, Texas 78701.

**RESPONSE**:  NETWORK admits CSC is the registered agent for service of process, but is without knowledge or information sufficient to form a belief as to the truth of the remainder of the allegation.

15.      Defendant Onvoy, LLC is or has been an interconnected VolP provider, a known TCPA violator with its headquarters at 550 West Adams Street, Suite 1130, Chicago, IL 60661.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

16.      Defendant, Peerless Network, Inc. is or has been an interconnected VolP provider, a known TCPA violator with its headquarters at 433 West Van Buren Street, Suite  410S, Chicago, IL 60607.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

6

17.     Defendant, Berken Media is a lead generation company that specializes in legal case generation for plaintiff lawyers and laws firms with its corporate address at 633 Chestnut St., Chattanooga, TN 37450.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

18.     Defendant Bandwidth, Inc. is an interconnected VolP service provider, a known TCPA violator with its headquarters at Venture Center III, 900 Main Campus Drive, Raleigh, NC 27606.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

19.     Unless otherwise indicated, the use of Defendant's name in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, vendors, and insurers of Defendants.

**RESPONSE**: The allegation is an improper attempt to make non-parties subject to this litigation without due process and NETWORK denies this allegation.

## Acts of Agents

20.     Whenever it is alleged in this petition that any Defendant did any act, it is meant that the Defendant performed or participated in the act or that Defendant's officers, agents, or employees performed or participated in the act on behalf of and under the authority of a Defendant.

**RESPONSE**:  The allegation is an improper attempt to generally plead liability through the principals of agency without alleging sufficient facts to establish such liability and NETWORK denies this allegation.

## Factual Allegations

**A.     The National Do Not Call Registry**

21.     In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry.  In so doing, Congress recognized that "[u]nrestricted telemarketing…. can be an intrusive invasion of privacy[.]" Telephone Consumer Protection Act of 1191, Publ. L. No. 102-243, §2(5) (1991) (codified at 47 U.S.C. §227).

**RESPONSE**:  In response to the allegations in the first sentence, NETWORK admits that Congress enacted the TCPA in 1991 and denies the remaining allegation.  In response to the allegation in the second sentence, NETWORK admits that it is a quote from the Telephone Consumer Protection Act of 1991, Publ. L. No. 102-243, §2(5) (1991).

22.     The DNCR allows consumers to register their telephone numbers and thereby indicate their desire not to receive telephone solicitations at those numbers.  See 47 C.F.R. §64.1200(c)(2). Just as Plaintiff registered years ago.

**RESPONSE**:  The allegation contained in the first sentence is a legal conclusion to which no response is required.   NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation in the second sentence.

23.     A listing on the DNCR "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." *Id*. Plaintiff's registration on the DNCR is active and has not been removed. *Id*.

**RESPONSE**: The allegation in the first sentence is a legal conclusion to which no response is required.  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation in the second sentence.

24.     The TCPA and implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers to the DNCR and provides a private right of action against any entity that makes those calls, or "on whose behalf" such calls are promoted.  47 U.S.C. §227(c)(5); 47 C.F.R. §64.1200(c)(2).  Pre-trial discovery should reveal on whose behalf the nearly 700 robo calls received by Plaintiff were promoted upon.   The true names of the sellers/telemarketers are also liable in this action.

**RESPONSE**:  These allegations are legal conclusions and legal arguments to which no response is required.

25.     The FCC's regulation implementing the TCPA also requires persons or other entities that make telemarketing calls to maintain company-specific do-no-call lists to honor to-not-call requests.  47 C.F.R. §64.1200(d).  Company-specific do-not-call requests must be honored for five years from the time the request is made.  47 C.F.R. §64.1200(d)(6).  Sellers must coordinate the do-not-call requests received by their telemarketers, so that all telemarketing calls on behalf of the seller cease if a consumer makes a do-not-call request to one of the seller's telemarketers.

**RESPONSE**:  These allegations are legal conclusions and legal arguments to which no response is required.

### B.     The TCPA Restrictions on Calls Using Artificial or Prerecorded Voices

26.     The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice… to any telephone number assigned to a …cellular telephone service without the prior express consent of the recipient."  See 47 U.S.C. §227(b)(1)(A).

**RESPONSE**: This allegation is a legal conclusion and legal argument to which no response is required.

27.     The TCPA provides a private cause of action to persons who receive calls in violation of 47 U.S.C. §227(b)(1)(A).  See 47 U.S.C. 227(b)(3).

**RESPONSE**: This allegation is a legal conclusion and legal argument to which no response is required.

28.     According to findings by the Federal Communication Commission ("FCC"), the agency Congress vested with authority to issue regulations implementing the TCPA, such calls are prohibited because, as Congress found, automated or prerecorded calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient.

**RESPONSE**:  These allegations are legal conclusions and legal arguments to which no response is required.

29.     The FCC also recognized that "wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used." *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, CG Docket No. 02-278, Report and Order, 18 FCC Rcd 14014, 14115 ¶ 165(2003)

**RESPONSE**:  This allegation is a legal conclusion and legal argument to which no response is required.

30.     In 2012, the FCC required prior express written consent for all autodialed or prerecorded telemarketing calls ("robocalls") to wireless numbers and residential lines. Specifically, it ordered that:

> [A] consumer's written consent to receive telemarketing robocalls must be signed and by sufficient to show the consumer: (1) received "clear and conspicuous disclosure" of the consequences of providing the requested consent, i.e., that the consumer will receive future calls that deliver prerecorded messages by or on behalf

of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. [] In addition, the written agreement must be obtained "without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd 1830, 1844 (2012).

**RESPONSE**: These allegations are legal conclusions and legal arguments to which no response is required.

31.     Under the TCPA, the burden is on the Defendant to demonstrate that Plaintiff gave his prior express consent to receive a call featuring a prerecorded message and artificial voices to his cellular that is currently on the DNCR.  In this case, neither Defendant is able to prove such burden.

**RESPONSE**:  NETWORK denies these allegations.

**C.     Technology Used In Robocalling Schemes and the Deceptive Business Practices, Deceptive Marketing Scams That Onvoy, Bandwidth, Berken Media and Peerless Facilitate and or Allow in Illegal Calls to Plaintiff**

32.     Defendant's Onvoy, Peerless, and Bandwidth are interconnected for profit VolP providers that provide their customer's – in this case, NISHD and other clients/telemarketers not yet named in this Complaint – with a full suite of VolP software and network connectivity to operate their telemarketing business and or obtain and generate leads to set and or schedule appointments.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.  NETWORK denies that it is a customer of the other named Defendants.

33.     Onvoy states on their parent company's (Sinch) website, "Reach any mobile phone on the planet with our powerful messaging APIs."  "People trust what they recognize and with a

local phone number, you're halfway through their door already." "140 million phone numbers powered by our network."

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

34.     Onvoy claims it has "True global reach" because it can "[r]each any mobile phone on the planet, in seconds or less. Sinch also claims it is a "One-stop shop" offering "CPaas, SMS, Voice, Video, Verification, SMS, rich messaging, SaaS and more…we're here for all your mobile messaging needs."  Finally, Sinch claims to offer "World-class support" and advertises its customer service claiming "[w]e don't want to sell you a product.  We want to help you succeed.  Enterprises love our superior customer service!"  Sinch advertises on its website that "You can depend on us," that it has 115,000,000 phone numbers powered by its network with 300,000,000,000 minutes of use on its network annually.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

35.     Peerless boasts that "Peerless Network has always been at the forefront of innovation, originally re-thinking and re-shaping how telecom markets should work.  We designed a smart, efficient, strategic network, and developed products and solutions that optimize how traffic can be handled.  We are driven to continuously expand our network reach, including international locations, and strive to simplify how customers communicated… drive to adapt and thrive in an ever-changing marketplace."

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

36.     Bandwidth boasts that it has access to millions of phone numbers across more than 60 countries.  Bandwidth also makes mention that robocalling, i.e., "…the term "robocalling" has become commonly understood to broadly mean illegal calling by scammers for fraudulent purposes.  Unfortunately, people are often not sure whether the calls they are receiving are legitimate or unlawful robocalls.  One sure sign of an illegal robocall is when a caller does not leave a voicemail message when you fail to answer the call…would advise anyone to quickly hang up if the caller does not provide satisfactory identification at the beginning of the call, or if you're not offered the option to opt out….automated and pre-recorded calls are not allowed if they do not have your written consent, or if your number is on the National Do Not Call list.  Note however, that certain kinds of robocalls may not require your consent."

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

37.     Bandwidth further promotes on their website, "…real-time caller ID on origination calls powered by Bandwidth. Ensure your customers know who's calling, because when it comes to voice calls, everybody should know your name."

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

38.     Berken Media promotes itself as a "Advertising Agency" on its Facebook page.  In reality, Berken generates leads via the robo calling (call center overseas) to individuals who are on the DNCR, like plaintiff.  Plaintiff received about eighty-seven (87) robo calls from Berken since January 2023 with the majority of illegal robo calls recorded.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

39.     The technical ability to place robocalls is depending on (1) voice-over-interest-protocol (VoIP) and related technology to create the calls, and (2) a "gateway carrier" to introduce the (often foreign) phone traffic into the U.S. phone system.  The term "gateway carrier" refers to a U.S.-based person or entity that agrees to accept VoIP traffic (often from a foreign source) and either pass the traffic to a downstream VoIP carrier or deliver the call directly to the consumers' phone thereby routing the calls to their final destination in the United States. VoIP uses broadband internet connection – as opposed to an analog copper phone line – to place calls locally, long distance, and internationally, without regard to whether the call recipient uses a cellular phone or a traditional, wired phone.  The technology employed by modern telecommunication providers mediates between digital VoIP signals and regular telephone signals so that communication is seamless between VoIP users and non-VoIP users at the other end.  VoIP is used in telemarketing schemes both to make the initial robocall to U.S. phones and to communicate with individuals who either answer the robocall or call the number contained in the recorded message.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

40.     VoIP relies upon a set of rules for electronic-communication called Session Initiation Protocol (SIP).  Much like the way browsing websites on the internet uses HyperText Transfer Protocol (HTTP) to initiate and conduct information exchanges between the devices through exchanges of packets of information, SIP is a set of rules used to initiate and terminate live sessions for things such as voice and video communication between two or more points connected to the internet.  Both SIP voice communication and HTTP web-browsing rely on exchanging data packets between two points.  For example, web browsing via HTTP requires an individual to request information from another point on the internet, usually by clicking on a

hyperlink or entering a web address in the browsers address bar, usually preceded by http://www, which tells the device that it is making a request for information on the World Wide Web via HTTP. A device receiving that request will send back information to the requesting device, and thus, the requesting device will display the requested website.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

41.    Similarly, a voice call via SIP starts as a data packet sent to initiate a call, a responsive packet sent back that indicates whether the call has been answered, and numerous other packets transiting back and forth; amongst these data packets is information that machines turn into audible signals, i.e., a conversation that can be heard by the participants.  In the case of robocalls, a recorded message is transmitted once the call is answered by voicemail picking up or a live person answering.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

42.    Robocalls should not be understood as traditional phone calls.  Rather, they are requests for information and responsive data packets transiting the internet via SIP.  An outgoing robocall begins as a request for information sent by an automated system for selecting and dialing telephone numbers that enables the caller to make millions of sequential requests for information (i.e., outbound VolP phone calls) in a very short time.  This is a specialized type of telecommunications equipment with the capacity to (1) store or produce telephone numbers to be called, and (2) request responsive information from devices at the other end of the call, i.e., dial telephone numbers.  The requests for information are directed to devices (here, telephones) that send back, responsive information when the call is answered either by a live person or the person's

voicemail.  When it receives information from the called device indicating that the call is answered, it will then send information back to that device (the phone) in the form of a recorded message.

**RESPONSE:**  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

43.    Upon information and belief, Defendants Onvoy, Bandwidth and Peerless create these recordings with artificial voices (or "bot" voices) as Plaintiff has received and recorded the inbound illegal robo calls during his answering of his cell phone and recording such bot voices.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegations.

44.    These robocalls made by the three amigo Defendants can not only send prerecorded messages to the plaintiff's phone, but can misrepresent who is calling on the caller ID.  Normally, a recipient's caller ID will display information identifying the caller by means of a telephone number, however many VolP software packages allow the caller to specify the information appearing on the call recipient's caller ID, much in the same way an email's subject line can be edited to state whatever the sender wishes.  This practice of specifying what appears on the recipient's caller ID is called "spoofing."  This feature of VolP technology permits a caller with an illicit motive to spoof a legitimate phone number in order to cloak the fraudster with indicia of authority and induce the recipients to answer the call.  Spoofing also encourages potential victims to return calls when they look up the spoofed number and see that it is a number used by an official government entity.  In the robocall schemes described throughout this Complaint, spoofing serves the purpose of deceiving the potential target of an unsolicited robocall about who is calling them.

**RESPONSE**: NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

45.      Spoofing any phone numbers is a simple matter of editing a SIP file to state the desired representation on the caller ID.  These files can then be loaded by either of these TCPA violators into an automatic system for the selection and dialing of telephones to become robocalls, replicated millions of times with the spoofed, fraudulent caller ID information.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

46.      The robocalls generally leave prerecorded messages containing misinformation.  Some of these messages direct the recipient to press a key to speak with a live operator.  Other messages leave a domestic telephone number as a "call-back" number.  In either case, the recipient is connected to a fraudster at a (often foreign) call center.  Robo calls, for instance, like the ones Plaintiff received, a high percentage being pre-recorded messages but have the capability to be transferred to a live and scheming professional fraudster who attempts to deceptively obtain personal information from the consumer, in this instance, the plaintiff as evidenced by the actual hundreds of live recordings between the robocaller and himself.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

**D.      Defendant Onvoy, Peerless, Bandwidth and Berken Media Scheming, Deceptive and Illegal Business Practices Demonstrate They Are Liable for Making the Calls at Issue to Plaintiff**.

47      Onvoy, Bandwidth, Peerless are interconnected VolP providers that are in the business of facilitating or initiating robo calls and/or helping others make robocalls, regardless if it violates the TCPA and or any other federal statute.  Onvoy's parent company Sinch states on its website that it provides voice termination, which means it carriers calls from overseas and passes them into the U.S. telephone system and will pass calls from the United States to overseas

destinations.  With respect to many of the robocalls described throughout this Complaint for which Defendant provides termination services, it is a gateway carrier.   In the context of these telemarketing schemes, U.S.-bound robocalls are "U.S. terminat[ed]" calls and return calls to telemarketing fraudsters in other countries are "international voice terminat[ed} calls.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

48.    Onvoy, Peerless and Bandwidth also provide the telephone numbers used to make these calls, the network through which these calls are placed, the hardware and software needed to make the calls, and the automated equipment needed to make massive amounts of robocalls. Defendant, Onvoy, Bandwidth and Peerless are the ones that make or initiate the actual call to consumers using their VoIP technology.   Upon information and belief, telemarketer's in foreign call centers merely wait for Peerless, Bandwidth, Onvoy to route a live caller to the call center if the recipient does not hang up immediately or ignores the call.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

49.    Upon information and belief, Onvoy, Bandwidth and Peerless know or consciously avoided knowing that telemarketers or sellers were transmitting robocalls across their networks and using Onvoy's, Bandwidth and Peerless VoIP services to send call traffic that violated federal and state laws.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegations.

50.     Onvoy, Bandwidth and Peerless have provided substantial assistance to robocallers and facilitated the transmission and eventual delivery of pre-recorded telephone calls to Plaintiff's cell number.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegations.

51.     Onvoy, Bandwidth and Peerless and their clients and or customers made or initiated calls to Plaintiff's cell phone using artificial and or prerecorded voices to deliver messages without the prior express consent of the called party, being the named plaintiff herein.  Some of Onvoy's, Bandwidth and Peerless customers were telemarketers, sellers, scammers and or fraudsters trying to obtain personal (social Security #, Date of Birth, credit card #) information from plaintiff as evidenced by the recordings.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegations.

52.     Onvoy, Bandwidth and Peerless facilitated the transmission of robocall campaigns and or calls from the telemarketer and or seller to Plaintiff's cell number whereas the robocallers:

(a)     Misrepresented material aspects of goods or services, in violation of 16 C.F.R. 310.3(a)(2)(iii);

(b)     Misrepresented the seller's or telemarketer's affiliation with corporations or government entities, in violation of 16 C.F.R. 310.3(a)(2)(vii);

(c)     Made false or misleading statements to induce any plaintiff to pay for goods or services, in violation of 16 C.F.R. 310.32(a)(4);

(d)     Failed to transmit or cause to be transmitted the real telephone number and the name of the telemarketer to caller identification services used by call recipients, in violation of 16 C.F.R.310.4(a)(8);

(e)     Initiated or caused the initiation of outbound calls to a telephone number of the DNCR, in violation of 16 C.F.R. 310.4(b)(1)(iii)(B);

(f)      Initiated or caused the initiation of outbound telephone calls that delivered prerecorded messages in violation of 16 C.F.R. 310.4(b)(1)(v); and/or

(g)      Failed to disclose the identity of the seller of the goods or services truthfully, promptly, and in a clear and conspicuous manner to the plaintiff who was receiving the robocall, in violation of 16 C.F.R. 310.4(d)(1).

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegations.

53.      Onvoy, Bandwidth and Peerless provide tailored and customized VolP services to the needs of robocalling customers by enabling them to place a high volume of calls in quick succession, billing only for the duration of completed calls – typically in as little as 6-second increments-and ignoring clear indicia of illegal call traffic.  Defendants provided their customers with Direct Inward Dialing numbers ("DIDs"), which would appear to the person receiving the calls as the calling numbers or "caller IDs."

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegations.

54.      This service was likely provided to circumvent the procedural guardrails of the caller authentication framework of STIR/SHAKEN that would otherwise mark a randomly generated or used calling number as "unverified" and cause such calls to be blocked from being delivered to the called party at a network level by a downstream provider.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

55.      Defendants have quick and inexpensive access to millions of DIDs that they sell or lease to their cu[sic] Defendants sold DIDs in bulk and were capable of providing DIDs for telephone numbers from every area code in the United States.

**RESPONSE**:  The allegation appears incomplete and NETWORK is unable to respond to this allegation.   In an abundance of caution, NETWORK denies the allegations.

56.     The practice of "spoofing" is used deceptively by scammers to manipulate the caller ID system, so it appears that their calls are from legitimate phone numbers.  Defendants used DIDs for "neighbor" spoofing and/or "snowshoe" spoofing.  Neighbor spoofing is the practice of using caller ID numbers with the same area code and same or similar three-digit exchange as the call recipient to increase the odds of the call recipient answering the call due to the belief that the call is originating from the local area.  Snowshoe spoofing is the practice of using massive quantities of unique numbers for caller ID on a short-term or rotating basis to evade behavioral analytics detection, or to bypass or hinder call blocking or call labelling analytics based on the origination numbers.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

57.     Numbers used for snowshoeing are often numbers that cannot receive incoming calls.  Defendants actively participated in the initiation of, or assisted and facilitated in the initiation of, illegal robocalls that Plaintiff received.

**RESPONSE**:  NETWORK denies these allegations.

58.     Defendants Onvoy, Peerless and Bandwidth assisted and facilitated illegal robo calls that used neighbor spoofing when calling plaintiff.  Upon information and belief, another manner of spoofing is accomplished where the VoIP provider, i.e., Onvoy, Bandwidth and Peerless, taps into the phone line of a active Onvoy, Bandwidth or Peerless phone customer and uses that person's phone number to facilitate a outbound robo call.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

59.     Defendants Onvoy, Peerless and Bandwidth provided substantial support and assisted sellers and telemarketers engaged in illegal robocalling in many ways, including but not limited to:

(a)     making and/or routing their customers' and robocallers' illegal calls to Plaintiff's cell number;

(b)     upon information and belief, taking express steps to obscure the ownership of at least one of their customers and telemarketers from ITG and other third parties after the principal owner became the subject of federal and state law enforcement actions and formed another named entity to continue to conduct business under another entity name;

(c)     providing some customers and or telemarketers with DID rotation support, so that the customer could circumvent and undermine consumer, law enforcement, and industry efforts to block and mitigate illegal calls;

(d)     providing customers and telemarketers with the telephone numbers (DIDs or Caller IDs) used to make illegal calls to Plaintiff's cell number;

(e)     providing customers and or telemarketers with expertise on how to most effectively and profitably run their illegal robocalling and telemarketing schemes.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

60.     Without the support, assistance, facilitation, and participation of Defendants, the illegal robocalls sent by and through their network would not have reached Plaintiff [sic] cell phone over 700 times this year and growing daily.

**RESPONSE**:  NETWORK denies the allegation.

61.     Along with the basic functions of a VoIP carrier, Defendants Bandwidth, Peerless, Onvoy and Berken do a lot more.  Rather than just provide VoIP access, these Defendants create the content for the telemarketing campaigns they operate through their network.  For example,

Onvoy's parent company, Sinch, provides is[sic] artificial voice services to its clients.  On its website, Sinch admits it provides templates for these artificial voice bots and states in response to a FAQ asking, "How do I build a good bot?"  Sinch's answer:  We've got a lot of experience with bot design and are happy to share the wealth.  When you log in to the platform, you'll find best-practice templates to guide you.  You can use these or adapt them as you live-no additional cost.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

62.     It also advertises programable Voice API "that reaches customers on any platform or channel…Enjoy a high-quality voice experience, optimized delivery routes, and a carrier super network – all in one place."  Sinch also advertises on its website "call recording", creating pre-recorded messages for "customized online phone conversations," "text-to-speech," "number masking" (which prevents Caller ID from identifying the caller), and a "local presence" by assigning numbers to its customers that have the same area codes as the people their customers are trying to reach.  Sinch also advertises its text messaging services on its website.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

63.     Upon information and belief, Onvoy, Peerless and Bandwidth control the voice message template used as the template for the robocall, creates the artificial voice on the robocall, places the robocall to a recipient's cell phone using its VolP network, is fully aware that its customers are using its platform to engage in activity that violates the TCPA and many other laws.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

64.     Peerless, Bandwidth and Onvoy also control which telephone users receive the prerecorded message or artificial voice when the call is placed through its automated system for selecting and dialing telephone numbers.  This is apparent because they do not target a specific audience with their robocalls- they seem to call everyone.  The DNCR does not apply to these Defendants.  For example, these Defendants have sent hundreds of illegal robocalls to Plaintiff related to a "Medicare advisory services", yet Plaintiff is not on Medicare, not even close to applying for Medicare.  He also has received final burial expense calls from Defendants, but Plaintiff has not sought burial insurance.  Plaintiff also receives a substantial number of calls offering him car warranty products and accident claim/legal services from Berken.  Plaintiff has not sought or requested any of these services.  Not to mention the scam robo calls impersonating government entities and Amazon scam calls.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first, second, sixth, seventh, and eighth sentences.  NETWORK denies the allegations in the third, fourth, and fifth sentences to the extent the allegations are directed towards it.

65.     Upon information and belief, over a period of years, Defendants have received many notices, inquiries, warnings, complaints concerning fraudulent robocalls and other suspicious activity occurring on their systems.   These warnings and inquiries came from other consumers and lawsuits filed against them, an industry trade group, and governmental agencies.  Nevertheless, Defendant Onvoy continue to enable these telemarketing schemes by placing calls for other telemarketers/sellers using their VolP technology.  For instance, On May 10, 2022, Inteliquent, parent company of Onvoy was ordered by the Federal Trade Commission to cease and desist from transmitting illegal robocall traffic.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

66.   On March 17, 2023, the FTC ordered Peerless to also cease and desist from transmitting illegal robocall traffic.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

67.   Upon information and belief, some of the numbers that Defendant, Onvoy, Peerless, and Bandwidth have used to call Plaintiff are now assigned to different telephone carriers and or sellers.  Rather than shutting down illegal telemarketing practices on its network that it essentially created, Defendants merely sell, license or otherwise transfer the numbers to different companies (Commio, LLC, AirUS, Inc, MCI Metro, NUSO, LLC etc.) that have no idea these numbers are used as part of telemarketing practices that violate the TCPA. But the discovery process in these proceedings will reveal the truth.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first and third sentences.  NETWORK denies the allegations in the second sentence.

68.   Peerless is listed in the FCC's Robo call Mitigation Database.  Peerless certifies "that all voice traffic that originates on its network is authenticated with STIR/SHAKEN, consistent with 47 C.F.R. §64.6301(a)." *Id.*

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

69.   Onvoy, LLC is also listed on the FCC's Robo call mitigation Database.  Onvoy refers that they are the direct and or indirect parent of the entities, i.e. Sinch America, Inc.

Inteliquent, Inc. among others listed.  Onvoy also refers that they have a "Know your Customer Team" comprised of multiple employees…to test before it allows a party to become a new customer.  Apparently that test failed systemically when compared to the 700 plus illegal robo calls that Onvoy, Bandwidth, and Peerless facilitated and or allowed to Plaintiff's cell number while being on the DNCR.

**RESPONSE**: NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

70.    Listed Below are just a few of the over 700 seven-hundred robo/spoofed/pre-recorded calls that Plaintiff has kept record of since January 4, 2023.

| 1 | 4-Jan-23 | 9:35 AM | 1-971-299-2477 | Onvoy LLC-OR | Medicare robo call-recorded |
|---|----------|---------|----------------|--------------|------------------------------|
| 2 | 4-Jan-23 | 12:36 PM | 1-832-619-1466 | Spoofed CID | Pre-Recorded voice message from Jason w/Medicare – recorded |
| 3 | 4-Jan-23 | 4:34 PM | 1-832-633-3066 | Spoofed CID | Medicare robo call - recorded |
| 4 | January 5, 2023 | 1:21 PM | 1-832-768-2667 | Spoofed CID | Pre-Recorded voice message from Mary w/ Final Expense |
| 5 | January 5, 2023 | 3:12 PM | 832-462-5897 | Aerial | Pre-Recorded voice message from Emma w/ Final Expense |
| 6 | January 10, 2023 | 10:16 AM | 832-740-9597 | Sprint | Pre-Recorded voice message from Emma w/ Final Expense |
| 7 | January 10, 2023 | 4:39 PM | 1-832-644-0711 | Level 3 Comm | Robo call from Medicare – recorded |
| 8 | January 10, 2023 | 4:44 PM | 1-832-689-5285 | Spoofed CID | Pre-Recorded Message from Medicare recorded |
| 9 | January 17, 2023 | 12:52 PM | 1-601-374-7922 | Onvoy LLC | Pre-Recorded Message from Medicare recorded |
| 10 | January 18, 2023 | 10:59 AM | 1-832-681-4035 | Spoofed CID | Pre-Recorded voice message from |

| | | | | | Sophia- Accident Claims |
|---|---|---|---|---|---|
| 11 | January 19, 2023 | 8:41 AM | 1-832-703-4363 | Sprint | Pre-Recorded voice message from Emma w/ Final Expense |
| 12 | January 20, 2023 | 1:16 PM | 1-832-622-5926 | Spoofed CID | Pre-Recorded voice message from Emma w/ Final Expense |
| 13 | January 20, 2023 | 3:37 PM | 1-832-643-6080 | Spoofed CID – Aerial | Pre-Recorded voice message from Sophia Accident Claims – recorded |
| 14 | January 21, 2023 | 12:39 PM | 1-832-694-4915 | | Robo call from Mark at Solar Panel |
| 15 | January 23, 2023 | 9:58 AM | 1-432-233-1279 | Onvoy LLC-Tx | Pre-Recorded voice message from Elsa w/Medicare-recorded |
| 16 | January 23, 2023 | 1:52 PM | 1-832-693-3923 | Spoofed CID | Pre-Recorded voice message from Sophia – Acc. Claims – recorded |
| 17 | January 23, 2023 | 2:06 PM | 1-832-659-8782 | Spoofed CID | Pre-Recorded voice message From Alex w/Final Expense – recorded |
| 18 | January 203, 2023 | 5:22 PM | 1-770-273-7756 | Onvoy LLC – GA | Pre-Recorded voice message from Medicare robo |
| 19 | January 24, 2023 | 1:06 PM | 1-832-590-5550 | SW Bell | Pre-Recorded voice message from Alex w/Final Expense – recorded |
| 20 | January 24, 2023 | 5:52 PM | 1-832-224-3712 | Bandwidth.com | |

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

### Call Detail Records

71.     Every attempted or completed call that reaches a VoIP provider's network automatically generates a record, known as a "call detail record" or "CDR," which generally includes the following information:

(a)     The date and time of the call attempt;

(b)     The duration of the call (calls that fail to connect are generally denoted by a zero-second duration);

(c)     The intended call recipient's telephone number;

(d)     The originating or calling number from which the call was placed (which may be a real number or may be spoofed);

(e)     An identifier such as a name or account number for the upstream provider that sent the call attempt to the VoIP provider's network; and

(f)     An identifier for the downstream provider to which the VoIP provider attempts to route the call.

**RESPONSE**:   NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

72.     Since VoIP providers use these CDRs for billing purposes, they are incentivized to ensure that the CDRs are complete and accurate.  Pre-trial discovery should reveal an enormous amount of evidence against these TCPA violators that the jury can visualize and understand these Defendants liability.

**RESPONSE**:   NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

73.     CDRs are maintained for some amount of time by every provider in order to, at a minimum, accurately bill an upstream provider for accepting and routing its call traffic.  Illegal robocalls create distinctive and identifiable patterns in CDRs.  These calls are universally

unexpected and unwanted, so most recipients hang up the phone immediately.  Therefore, these calls typically connect for a very short duration, if at all.  CDRs for illegal robocalls will often feature a high percentage of calls that are only a few seconds long.  When examined in the aggregate, CDRs tend to show a very short average call duration.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

74.     Conversely, CDRs showing legitimate, consented-to robocalls or routine conversational call traffic typically have a much lower short call percentage and a much longer average call duration.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

75.     Also, improper or questionable Caller ID spoofing – where a calling number is used relatively infrequently in relation to the total number of calls that are made with that number – is often apparent in CDRs and is indicative of illegal robocalls.  Robocallers deceptively use spoofing to hide their identity, to circumvent call blocking and labeling tools, and to make it more likely that Plaintiff will answer their calls as he has answered such calls and quite strangely and eerie, are very similar to phone numbers of friends and family members.  Upon information and belief, these Defendants have "illegally" accessed Plaintiff's contacts to clone or duplicate similar numbers to spoof them.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

76.     Illegal robocallers frequently use caller ID spoofing to impersonate trusted organizations such as law enforcement, government agencies, and large corporations.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

77.     These organizations' phone numbers are publicly available, and when these numbers appear in CDRs for calls that originated abroad, these robocalls are irrefutably illegal.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

78.     Patterns of neighbor spoofing or impersonating trusted numbers are easy to detect when present in CDRs and indicate that the upstream provider is sending illegal calls across the downstream provider's network.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

79.     Another identifier of illegal robocalls captured by CDRs is the presence of high numbers of unique calling phone numbers initiating calls.  This technique of using a calling number only a handful of times to avoid detection by call blocking analytics is called "snowshoeing" or using "disposable" phone numbers.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

80.     As described above, illegal robocallers and telemarketers use the "snowshoeing" method of spoofing – using a calling number only once or a handful of times to avoid detection – to prevent large provides and legitimate companies from identifying and blocking the phone numbers the bad actors are using to perpetrate scam calls.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

81.     The presence of high-rates of calls to phone numbers on the DNCR is another way to distinguish illegal robocalls and telemarketing calls from legitimate calls.  Substantial volumes of illegal calls are placed to phone numbers on the DNCR because problematic robocallers are unlikely to respect legal prohibition on calling numbers on the DNCR.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

**Plaintiff's Factual Allegations**

82.     On January 5, 2023, the intrusive, annoying, disruptive, deceptive and harassing robo calls started to get logged and recorded.  A telemarketing campaign of pre-recorded messages and spoofed caller ID's from Defendant NISHD, in the company of Bandwidth, Peerless, Onvoy and Berken Media commenced relentlessly about final expense, diabetic services, United States Customs, Amazon scams, Solar services, accident legal/claims and medicare services and also masquerading as "senior benefits."

**RESPONSE:**  NETWORK denies the allegations.

83.     Plaintiff, is a full-time remote worker in the recovery financial industry.  During his work hours, from 8:00 am thru 6:00 pm, is when the barrage of illegal robo calls have transpired, with the occasion[sic] weekend robo calls.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence.  NETWORK denies the allegations in the second sentence except that NETWORK is without knowledge or information sufficient to form a belief as to the truth of Plaintiff's stated work hours.

84.     At all times relevant, Plaintiff owned a cell phone, the number for which was 832-XXX-7311 (hereinafter cell-phone") and utilized this phone number ending in 7311 as a personal, household and family cellular telephone on a daily & continuous basis.

**RESPONSE**:   NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

85.     Plaintiff's 7311 number has been registered with the national DNCR since September 29, 2011 and at all times relevant to this action.  Plaintiff subsequently checked with the website verify@donotcall.gov to further confirm that his cell number was still registered with the do-not-call governmental agency.

**RESPONSE**:   NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

86.     At the direction of Defendant NISHD, Onvoy, Bandwidth, Peerless and unknown telemarketing and 3rd party sellers and or telemarketers directed by Defendant NISHD have placed a "multitude" of unsolicited intrusive & harassing final expense, diabetic services, accident claims, solar and U.S. Customs scam calls and medicare robo spoofed calls and or text messages to Plaintiff on his personal cellular phone for solicitation purposes.

**RESPONSE**:   NETWORK denies the allegations.

87.     Plaintiff did not request any type of information from any of the named Defendants herein or third parties directed by Defendant NISHD about medicare, final expense/burial services or products, accident claims, Solar, and electricity products.  NISHD did not have any type of consent to contact Plaintiff on a consistent & harassing basis nor any prior business relationship exist.

**RESPONSE**:   NETWORK denies the allegations.

88.     Plaintiff was not interested in purchasing any type of medicare, diabetic services, accident claim legal services and or final expense/low cost burial insurance products and or services from any of these named Defendants.

**RESPONSE**:  NETWORK denies the allegations.

89.     Defendant's seven-hundred (700) plus intrusive and harassing pre-recorded robo and spoofed phone calls were transmitted to Plaintiff's cellular telephone and within the time frame relevant to this action.

**RESPONSE**:  NETWORK denies the allegations.

90.     Defendant's seven-hundred (700) plus intrusive robo-calls constitute telemarketing because they encouraged the future and or present purchase or investment in property, goods, or services, i.e. selling this Plaintiff final expense/low cost burial insurance, medicare services, accident legal services, solar, Electricity and Diabetic services.

**RESPONSE**:  NETWORK denies the allegation and denies making any calls to Plaintiff.

91.     Defendant's seven-hundred (700) spoofed/pre-recorded robo calls were not made for "emergency purposes."

**RESPONSE**:  NETWORK denies the allegation and denies making any calls to Plaintiff.

92.     Plaintiff received the subject pre-recorded robo-calls and spoofed robo-calls within this judicial district and, therefore, Defendant's violation of the TCPA occurred within this district.

**RESPONSE**:  NETWORK denies the allegation and denies making any calls to Plaintiff.

93.     Defendant's pre-recorded robo and spoofed robo calls/texts were not made for an emergency purpose or to collect a debt pursuant to 47 U.S.C. §227(b)(1)(B).

**RESPONSE**:  NETWORK denies the allegation and denies making any calls or texts to Plaintiff.

94.     Upon information and belief, Defendant NISHD or Berken Media do not have a written policy for maintaining an internal do not call list pursuant to 47 U.S.C. §64.1200(d)(1).

**RESPONSE**:  NETWORK denies the allegation.

95.     Upon information and belief, Defendant NISHD or Berken Media do not inform and or train its personnel (marketing staff members) engaged in telemarketing in the existence and the use of any internal do not call list pursuant to 47 U.S.C. §64.1200(d)(2).

**RESPONSE**:  NETWORK denies the allegation.

96.     At no point in time did Plaintiff provide any of the named Defendants with his express written consent to be contacted twice or more daily during Plaintiff's work week.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

97.     Plaintiff is the subscriber and sole user of the cell-phone number and is financially responsible for phone service to the cell number.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

98.     On July 14, 2023 – Plaintiff received a robo-spoofed call from a rookie telemarketer with a spoof caller ID# of 832-514-6886 (call recorded).  Plaintiff provided personal information to the robo telemarketer for the sole purpose to discover who the elusive TCPA violator was. Plaintiff had previously attempted an estimated 47 times to get to a verifier & scheduler but those efforts were futile.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

99.     On July 15, 2023, Plaintiff received a call-back (recorded) to his cell phone from insurance agent Ashley Johnson ("Johnson"), who is a licensed State of Texas insurance agent General Lines Agent #2896442.  Plaintiff set up an appointment with Johnson at his home to discover the continuous & elusive violator of the DNCR to Plaintiff's cell number.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

100.     On July 18, 2023, Plaintiff discovered who the TCPA corporate violator was, being Defendant NISHD upon reading the Individual Life Insurance Application underwritten by United of Omaha Life Insurance Company.  The name of NISHD clearly and accurately shows as the General Agent/General Manager Name on this application.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

101.     Defendant, NISHD, a corporate entity is a stranger to TCPA litigation within the federal court system.

**RESPONSE**:  NETWORK admits the allegation.

102.     The TCPA's implementing regulation, 47 C.F.R. §64.1200(c) provides that "[n]o person or entity shall initiate any telephone solicitation" to "[a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the federal government.

**RESPONSE**:  This allegation is a legal conclusion and legal argument to which no response is required.

103.     Many times has Aguilar (recorded calls) stated to the heavily accented and or foreign Final Expense, Medicare and Accident Claims telemarketing reps to remove Plaintiff from

their calling list, to stop calling, opt-him-out from the call lists but still the intrusive, disruptive and harassing robo calls continue daily (700 plus illegal robo calls) at the time of the filing of this lawsuit.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

104.    Defendant's unsolicited robo-calls caused Plaintiff actual harm, including invasion of his privacy, aggravation, annoyance, intrusion on seclusion, trespass, and conversion during Plaintiff's work week.  Defendant's harassing and abusive robo calls have caused a disruption to his daily life activities, anxiety and emotional distress when his cell phone rings.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation.

**COUNT I**
**Defendant Violated The TCPA 47 U.S.C. §227(b)**
**Telemarketing in Violation of the TCPA's Do-Not-Call Provision**

105.    Plaintiff incorporates the foregoing paragraphs 1-81 as though the same were set forth at length herein.

**RESPONSE**:  NETWORK restates its responses to Paragraphs one (1) through eighty-one (81) as if fully restated herein.

106.    The TCPA's implementing regulation, 47 C.F.R. §64.1200(c), provides that "[n]o person or entity shall initiate any telephone solicitation" to "[a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the federal government."

**RESPONSE**:  This allegation is a legal conclusion and legal argument to which no response is required.

107.    47 C.F.R. §64.1200(e) provides that §64.1200(c) and (d) "are applicable to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers."

**RESPONSE**: This allegation is a legal conclusion and legal argument to which no response is required.

108.    47 C.F.R. §64.1200(d) further provides that "[n]o person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity.

**RESPONSE**: This allegation is a legal conclusion and legal argument to which no response is required.

109.    Any "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may bring a private action based on a violation of said regulations, which were promulgated to protect telephone subscribers' rights to avoid receiving telephone solicitations to which they object. 47 U.S.C. §227(c).

**RESPONSE**: This allegation is a legal conclusion and legal argument to which no response is required.

110.    Defendant's calls to Plaintiff were not made for "emergency purposes."

**RESPONSE**: NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation and denies making any calls to Plaintiff.

111.    The seven-hundred (700) plus robo calls allowed and or facilitated by the named Defendants herein have been intrusive, disruptive, aggravating & such pre-recorded and spoofed robo calls to Plaintiff's cellular telephone were initiated without any prior express consent.

**RESPONSE**:  NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation and denies making any calls to Plaintiff.

112.    Named Defendant's herein violated 47 C.F.R. §64.1200(c) by initiating, or causing to be initiated, telephone solicitations to telephone subscribers such as Plaintiff who registered his respective telephone numbers on the National DNCR, since September 2011.

**RESPONSE**:  NETWORK denies the allegation.

113.    Named Defendants herein violated 47 U.S.C. §227(c)(5) because Plaintiff received more than one telephone call and or robo-text message(s) in a 12-month period made by or on behalf of Defendant in violation of 47 C.F.R. §64.1200, as described above.  As a result of Defendant NISHD conduct as alleged herein, Plaintiff suffered actual damages and under section 47 U.S.C. §227(c), are entitled, inter alia, to receive up to $500 in statutory damages for each illegal robo and spoofed call in violation of 47 C.F.R. §64.1200, 47 U.S.C. 227(c)(5).

**RESPONSE**:  NETWORK denies the allegation.

114.    The acts and/or omissions of Defendant were done unfairly, unlawfully, intentionally, deceptively and fraudulently and absent bona fide error, lawful right, legal defense, legal justification or legal excuse.

**RESPONSE**:  NETWORK denies the allegation.

115.    To the extent of the named Defendant's misconduct is determined to be willful and knowing, the Court should, pursuant to 47 U.S.C. §227(c)(5), treble the amount of statutory damages.  Further, named Defendants are liable for these violations either directly and through the

principles of ratification, as joint venturers, or by knowingly engaging in a conspiracy to make and or facilitate illegal robo calls to Plaintiff in violation of the TCPA.

**RESPONSE**: NETWORK denies the allegation.

### COUNT II
### Defendant Violated The TCPA 47 U.S.C. §227(C)

116.    Plaintiff incorporates the foregoing paragraphs 1-81 as though the same were set forth at length herein.

**RESPONSE**:  NETWORK restates its responses to Paragraphs one (1) through eighty-one (81) as if fully restated herein.

117.    The TCPA prohibits any person or entity of initiating any telephone solicitation to a residential telephone subscriber who has registered his or her telephone number on the National DNCR of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government. 47 U.S.C. §227(c).

**RESPONSE**:  This allegation is a legal conclusion and legal argument to which no response is required.

118.    Defendant NISHD contacted Plaintiff despite the fact that Plaintiff has been on the Do Not Call Registry since 2011.  As of date, Plaintiff still maintains his cell number on the Do-Not-Call Registry.

**RESPONSE**: NETWORK denies the allegation in the first sentence. NETWORK is without knowledge or information sufficient to form a belief as to the truth of the allegation in the second sentence.

119.    Defendants have facilitated and or initiated robocalls to Plaintiff on two or more occasions during a single calendar year despite Plaintiff's registration on the DNCR list.

**RESPONSE**:  NETWORK denies the allegation.

120.     Under 47 C.F.R. §64.1200(d), "[n]o person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity.  The procedures instituted must meet certain minimum standards, including:

> (3) Recording, disclosure of do-not-call requests.  If a person or entity making a call for telemarketing purposes (or on whose behalf such a call is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not call list at the time the request is made.  Persons or entities making calls for telemarketing purposes (or on whose behalf such calls are made) must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made.  This period may not exceed thirty days from the date of such request…

> (6)   Maintenance of do-not-call lists.   A person or entity making calls for telemarketing purposes must maintain a record of a consumer's request not to receive further telemarketing calls.  A do-not-call request must be honored for 5 years from the time the request is made.

47 C.F.R. §64.1200(d)(3), (6)

**RESPONSE**:  These allegations are a legal conclusion and legal argument to which no response is required.

121.     The acts and/or omissions of named Defendant's herein were done unfairly, unlawfully, intentionally, deceptively and fraudulently and absent bona fide error, lawful right, legal defense, legal justification or legal excuse.

**RESPONSE**: NETWORK denies the allegation.

122.     Under 47 C.F.R. §64.1200(e) the rules set forth in 47 C.F.R. §64.1200(d) are applicable to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers:

(e)  The rules set forth in paragraph (c) and (d) of this section are applicable to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers to the extent described in the Commission's Report and Order, CG Docket No. 02-278, FCC 03-153, "Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991

47 C.F.R. §64.1200(e)

**RESPONSE**:  These allegations are a legal conclusion and legal argument to which no response is required.

123.    Plaintiff made requests to named Defendant's herein agents, subcontractors, representatives, servants not to receive any more phone calls.

**RESPONSE**: NETWORK denies the allegation.

124.    Named Defendant's herein failed to honor Plaintiff's requests on two or more separate occasions.

**RESPONSE**:  NETWORK denies the allegation.

125.    Because Plaintiff received more than one robo call in a 12-month period made by or on behalf of named Defendants' in violation of 47 C.F.R. §64.1200(d), as described above, Defendants violated 47 U.S.C. §227(c)(5).

**RESPONSE**:  NETWORK denies the allegation.

126.    As a result of named Defendant's violations of 47 U.S.C. §227(c)(5), Plaintiff is entitled to an award of $500.00 in statutory damages, for each and every negligent violation, pursuant to 47 U.S.C. §227(c)(5).

**RESPONSE**:  NETWORK denies the allegation.

127.    As a result of named Defendant's violations of 47 U.S.C. §227 (c)(5), Plaintiff is entitled to an award of $1,500.00 in statutory damages for each and every knowing and/or willful violation, pursuant to 47 U.S.C. §227(c)(5).

**RESPONSE**:  NETWORK denies the allegation.

128.    Plaintiff also suffered damages in the form of invasion of privacy. Moreover, Plaintiff is on the State of Texas Do Not Call List.

**RESPONSE**:  NETWORK denies the allegation.

**COUNT III**
**Defendant Violated §302.101 Of**
**The Texas Business  & Commercial Code**

129.    Plaintiff incorporates the foregoing paragraphs 1-81 as though the same were set forth at length herein.

**RESPONSE**:  NETWORK restates its responses to Paragraphs one (1) through eighty-one (81) as if fully restated herein.

130.    §302.101 of the Texas Business & Commerce Code prohibits sellers from engaging in telephone solicitation from a location in this state or to a purchaser located in this state unless the seller obtains a registration certificate from the Office of the Secretary of State for the business location from which the solicitation is made.

**RESPONSE**:  This allegation is a legal conclusion and legal argument to which no response is required.

131.    Named Defendants, sellers, telemarketers violated §302.101 of the Texas Business & Commercial Code when its representatives engaged in continuous and repetitive telephone solicitation of Plaintiff without obtaining a registration certificate from the Office of the Secretary of State.

**RESPONSE**:  NETWORK denies the allegation.

132.    §302.302(a) of the Texas Business & Commerce Code provides that a person who violates this chapter is subject to a civil penalty of no more than $5,000.00 for each violation.

Furthermore, §302.302(d) provides that the party bringing the action is also entitled to recover all reasonable cost of prosecuting the action, including court costs and investigation costs during discovery, deposition expenses, witness fees that will be required and needed upon the trial before a jury.

**RESPONSE**: This allegation is a legal conclusion and legal argument to which no response is required.

**COUNT IV**
**Defendants Onvoy, Peerless, Bandwidth, Berken Media & NISHD Have Caused Intentional Infliction Of Mental Anguish And/Or Emotional Distress Upon Plaintiff**

133.    Plaintiff incorporates the foregoing paragraphs 1-81 as though the same were set forth at length herein.

**RESPONSE**: NETWORK restates its responses to Paragraphs one (1) through eighty-one (81) as if fully restated herein.

134.    Defendant NISHD, Onvoy's Bandwidth, Peerless and Berken's unlawful conduct as previously described in this complaint was systemically known to these TCPA violators that such egregious conduct would provide and did produce damages in anxiety, mental anguish and or emotional distress to this individual plaintiff herein.  As a direct and proximate result of thse Defendant TCPA abusers, such callous conduct has caused Plaintiff to suffer emotional distress and emotional damage that the jury in this case should determine: Defendant's callous disregard and egregious conduct as precisely described herein has been outrageous, wholly without legal or factual justification, such conduct was carried out in a malicious and wanton scheme to further their profits at a corporate level thus, Plaintiff should be allowed to recover punitive damages herein from each named Defendant.

**RESPONSE:** NETWORK denies the allegation.

**Prayer**

135.     NETWORK denies the allegations in Plaintiff's Prayer, including subparts a through i, and specifically denies that Plaintiff is entitled to any damages, injunctive relief, or any relief whatsoever.

**Demand For Jury**

136.     NETWORK denies that any of the allegations set forth in the Complaint allege triable issues against NETWORK.  To the extent a jury trial is permitted, NETWORK requests a trial by the maximum number of jurors allowed by law.

137.     NETWORK denies each and every, all and singular, the allegations contained in the Complaint that are not specifically admitted.

## AFFIRMATIVE DEFENSES

NETWORK hereby asserts the following defenses to the claims and allegations set forth in the Complaint.  By asserting these defenses, NETWORK does not admit that it bears the burden of proof or the burden of persuasion with respect to any particular defense.

### FIRST AFFIRMATIVE DEFENSE
#### (Consent)

Plaintiff is barred from asserting claims in whole or in part because the calls at issue were made with prior express permission or consent.

### SECOND AFFIRMATIVE DEFENSE
#### (Established Business Relationship)

Any and all TCPA and Texas Business & Commerce Code claims brought in the Complaint are barred by the Plaintiff's business relationships with the caller.

### THIRD AFFIRMATIVE DEFENSE
### (Acquiescence, Ratification, Estoppel, Waiver)

Plaintiff is barred from asserting claims, in whole or in part, by the equitable doctrines of acquiescence and ratification, estoppel, or waiver.

### FOURTH AFFIRMATIVE DEFENSE
### (Unclean Hands)

Plaintiff is barred from asserting claims, in whole or in part, by the doctrine of unclean hands and *in pari delicto*.  For example, Plaintiff cannot assert claims under the TCPA or the Texas Business & Commerce Code if he acted in bad faith by providing the subject telephone number referenced in the Complaint in order to receive calls.  Plaintiff invited the calls on which he now claims Defendants are liable.

### FIFTH AFFIRMATIVE DEFENSE
### (No Mitigation)

To the extent that the Complaint alleges that Plaintiff suffered any purported injury or damages, Plaintiff failed to take any and all reasonable or necessary actions to avoid or reduce his damages, and any damages awarded to him must be reduced accordingly.

### SIXTH AFFIRMATIVE DEFENSE
### (No Willful or Negligent Misconduct; Not Treble or Increased Damages)

Any claim for treble or increased damages is barred because NETWORK did not engage in knowing or willful misconduct.

### SEVENTH AFFIRMATIVE DEFENSE
### (No Proximate Cause)

NETWORK did not proximately cause any damages, injury, or violation alleged in the Complaint.  Instead, the acts of third parties (such as vendors, Plaintiff, or other persons who provided the numbers on which Plaintiff was allegedly called) proximately caused the damages, injuries, or violations at issue, to the extent they occurred.

## EIGHTH AFFIRMATIVE DEFENSE
### (No Standing)

Any and all claims brought in the Complaint are barred because Plaintiff lacks standing. A lack of Article III standing warrants dismissal under Fed. R. Civ. P. 12(b)(1), as the Court lacks proper subject matter jurisdiction over such claims. *See, e.g., Lopez v. Bronco Mfg.*, 2021 WL 10973332, at *1 n.1 (E.D. Tex. Feb. 10, 2021), *report and rec*. adopted 2021 WL 1090745 (Mar. 22, 2021) (citing *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F. 3d 787, 795 n.2 (5th Cir. 2011)); *see also Wendt v. 24 Hour Fitness USA, Inc.*, 821 F. 3d 547, 550 (5th Cir. 2016) (Without Article III standing, a plaintiff cannot "maintain an action in federal court."). In this regard, Article III of the U.S. Constitution confers on the federal judiciary the power to adjudicate only certain cases and controversies. To establish Article III standing, Plaintiff must plausibly allege that: (i) he suffered a concrete and particularized "injury in fact,"; (ii) there is a causal connection between his injury and the conduct complained of (i.e., causation); and (iii) his injury must be capable of being redressed by a favorable decision (i.e., redressibiltiy). *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *see also Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (the party invoking federal subject matter jurisdiction has the burden of establishing standing); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014) (the "causation" element requires that the "injury in fact" be "fairly traceable" to the defendant's conduct). And like under Rule 12(b)(6), the Court need not accept as true conclusory allegations under Rule 12(b)(1).

To meet the "causation" element, the "injury in fact" must be "fairly traceable" to NETWORK's conduct. *Lexmark,* 572 U.S. at 125; *see also Lujan*, 504 U.S. at 560-61 (an injury is not fairly traceable to the defendant if the injury complained of is "th[e] result [of] the independent action of some third party not before the court") (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)).

46

Here, because the Plaintiff failed to plead specific, non-contradictory facts showing any conduct attributable only to NETWORK as opposed to third parties, (and in some cases unknown third parties) let alone alleging any factual support other than conclusions to show that NETWORK had any relationship with any responsible third party, he lacks Article III standing; therefore the Court lacks federal subject matter jurisdiction and the Complaint should be dismissed under Rule 12(b)(1).

### NINTH AFFIRMATIVE DEFENSE
### (No Agency or Vicarious Liability and Proportional Allocation of Fault)

Any damages, injury, violation, or wrongdoing alleged in the Complaint was caused by third parties or Plaintiff for which NETWORK cannot be held vicariously liable.  Courts have recognized two potential theories of liability under the TCPA: (i) direct liability; and (ii) vicarious liability.  *See Rogers v. Postmates, Inc*., 2020 WL 3869191, at *3 (N.D. Cal. July 9, 2020) (citing *Thomas v. Taco Bell Corp*., 582 F. App'x 678, 679 (9th Cir. 2014)).   Thus, to be liable under the TCPA, "the person must either (1) directly make the call, or (2) have an agency relationship with the person who made the call."  *Pascal v. Agentra, LLC*, 2019 WL 5212961, at *2 (N.D. Cal. Oct. 16, 2019) (quoting *Abante Rooter & Plumbing v. Farmers Grp., Inc*., 2018 WL 288055, at *4 (N.D. Cal. Jan. 4, 2018)).  Plaintiff does not allege sufficient facts to support either theory of liability and therefore has failed to state a plausible TCPA claim.

Further, NETWORK did not authorize, ratify, encourage, participate in, aid, abet, or assist in any of the conduct alleged in the Complaint and cannot be held liable for it.  For example, to the extent contractors caused any damages, injury, violations of the law or wrongdoing or engaged in the conduct alleged in the Complaint, those vendors acted outside the scope or in violation of the parties' agreements and NETWORK did not approve of that conduct.  As such, NETWORK cannot be held vicariously liable.  And even if it could, its liability, if any, must be eliminated or

reduced by an amount proportionate to the fault attributable to third parties or the Plaintiff.  The Court is not permitted to presume the existence of an agency relationship between a principal and an agent.  An agent can only act to the extent authorized by the principal.  Accordingly, NETWORK cannot be held liable for the actions of any agent or independent contractor.

**TENTH AFFIRMATIVE DEFENSE**
**(Residential Number)**

Plaintiff's claims are barred to the extent his telephone number is not residential.

**ELEVENTH AFFIRMATIVE DEFENSE**
**(Reasonable Practices and Procedures)**

Any and all claims brought in the Complaint are barred in whole or in part because Defendant has established and implemented reasonable practices and procedures to prevent violations of the TCPA and related regulations, as well as the Texas Business & Commerce Code.

**TWELFTH AFFIRMATIVE DEFENSE**
**(Bona Fide Error)**

Any and all claims brought in the Complaint are barred in whole or in part because, to the extent there was any violation of the TCPA or Texas Business & Commerce Code, and related regulations (which is denied), any such violations were not intentional and resulted from bona fide error.

**THIRTEENTH AFFIRMATIVE DEFENSE**
**(Substantial Compliance)**

NETWORK is not liable to Plaintiff because NETWORK acted reasonably and with due care and substantially complied with all applicable statutes, regulations, ordinances, and/or other laws.

## FOURTEENTH AFFIRMATIVE DEFENSE
### (FCC Exceeding Delegated Authority)

Plaintiff's TCPA claims are barred to the extent they are based on regulations or rulings that exceed the FCC's delegated authority.  Nor can the Hobbs Act be validly or constitutionally applied to preclude NETWORK from raising defenses to an action arising under the TCPA or rules and regulations promulgated thereunder.

## FIFTEENTH AFFIRMATIVE DEFENSE
### (First Amendment)

The TCPA and the regulations and rules promulgated thereunder, violate the First Amendment of the United States Constitution, including by imposing content-based restrictions on speech that fail to withstand strict scrutiny.

## SIXTEENTH AFFIRMATIVE DEFENSE
### (One Call)

Any and all DNC-related claims brought in the Complaint are barred in whole or in part to the extent Plaintiff did not receive more than one telephone call within any 12-month period by or on behalf of NETWORK.

## SEVENTEENTH AFFIRMATIVE DEFENSE
### (Adequate Remedy at Law)

The Complaint fails to state a claim for injunctive relief because Plaintiff has an adequate remedy at law.  For example, the TCPA provides for statutory penalties of $500.00 to $1,500.00 per call, or monetary compensation for actual damages.

## EIGHTEENTH AFFIRMATIVE DEFENSE
### (Arbitration)

Plaintiff is barred from asserting claims in this forum to the extent their claims are subject to a binding arbitration agreement and an agreement to arbitrate their disputes, depriving the Court of jurisdiction over such claims and rendering venue in this Court improper.

### NINETEENTH AFFIRMATIVE DEFENSE
### (Due Process)

The application of the TCPA upon which the Complaint is based, including the imposition of statutory damages on NETWORK, would violate the Due Process provisions of the United States Constitution.  For example, certain definitions contained in the TCPA renders the statute unconstitutionally vague.  Additionally, the statutory penalties sought by Plaintiff are excessive.

### TWENTIETH AFFIRMATIVE DEFENSE
### (Policies and Procedures)

Plaintiff's Complaint, and the purported causes of action set forth therein, are barred by the TCPA's "Safe Harbor" provisions.  See 47 U.S.C. §227(c)(5)(C).

### TWENTY-FIRST AFFIRMATIVE DEFENSE
### (No Private Cause of Action)

In Count II of Plaintiff's Complaint, he alleges a violation of the Texas Business and Commerce Code §§302.101 and 302.302.  The Texas Business & Commerce Code §302.101 and §302.302 do not provide for a private cause of action.

### TWENTY-SECOND AFFIRMATIVE DEFENSE
### (Count IV Seeks a Remedy – Not a Cause of Action)

Count IV seeks actual damages alleged intentional infliction of mental anguish and/or emotional distress for violations of the TCPA.  This count is not a cause of action but seeks a remedy provided by the TCPA and, if proven, can be recovered as actual damages in Plaintiff's claims for violations of the TCPA.  This Count IV does not state a cause of action and should be dismissed.

### TWENTY-THIRD AFFIRMATIVE DEFENSE
### (Reservation of right to Assert Further Defenses)

NETWORK has not knowingly or intentionally waived any applicable defenses, and hereby gives notice that it intends to rely on such other and further affirmative defenses as may

become available during discovery in this action.   NETWORK reserves the right to amend its

Answer to assert any such defense.

### PRAYER FOR RELIEF

WHEREFORE, NETWORK prays for judgment as follows:

1.   That Plaintiff take nothing from NETWORK by reason of the Complaint and that

judgment be rendered in favor of NETWORK;

2.   For dismissal of the Complaint as to NETWORK with prejudice;

3.   That NETWORK recover its costs of court and reasonable attorneys' fees; and

4.   For such other and further relief as the Court may deem just and proper.


Respectfully submitted,


*Linda G. Moore*
Dawn Estes
State Bar No. 14251350
Southern Dist. No. 19909
Linda G. Moore
State Bar No. 14359500
Southern Dist. No. 20049
ESTES THORNE EWING & PAYNE PLLC
3811 Turtle Creek Blvd., Suite 2000
Dallas, Texas 75219
Telephone: (214) 599-4000
Telecopier: (214) 599-4099
destes@estesthorne.com
lmoore@estesthorne.com

ATTORNEYS FOR DEFENDANT NETWORK
INSURANCE SENIOR HEALTH DIVISION
ALG, LLC

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 20, 2023 Defendant's Answer and Affirmative Defenses was electronically transmitted to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Timothy Aguilar
2807 Randolph Road
Pasadena, Texas 77503

*/s/ Linda G. Moore*
Linda G. Moore